Alan D. ROBERTS, Plaintiff–Appellant,

v.

STATE OF MAINE, Defendant–Appellee.

No. 93–2392.

United States Court of Appeals,
First Circuit.

Heard April 6, 1994.

Decided Feb. 16, 1995.

Robert E. Sandy, Jr., with whom Sherman, Sandy & Lee, Waterville, ME, was on brief, for appellant.

Donald W. Macomber, Asst. Atty. Gen., with whom Michael E. Carpenter, Atty. Gen., Charles K. Leadbetter and Wayne S. Moss, Asst. Attys. Gen., Augusta, ME, were on brief, for appellee.

Before TORRUELLA, CYR and STAHL, Circuit Judges.

TORRUELLA, Chief Judge.

Maine's "implied consent" law imposes a two-day mandatory minimum jail sentence on defendants who refuse to take a blood/alcohol test and are later convicted of operating a motor vehicle under the influence of intoxicating liquor. 29 M.R.S.A. §§ 1312, 1312–B. Petitioner–Appellant Alan D. Roberts challenges the constitutionality of his conviction and sentence under this law because, prior to his decision not to take a blood/alcohol test, (1) a police officer informed Roberts of "the consequences" of refusing to take the test but did not mention the mandatory jail sentence, and (2) the police officer denied Roberts' request to call his attorney. We find that under the particular circumstances of this case, Roberts' constitutional right to due process was violated and his petition for writ of habeas corpus must be granted as to his two-day mandatory sentence.

## I. BACKGROUND

On January 25, 1991, Officer Alan Main of the Waterville, Maine Police Department stopped Roberts after Officer Main observed Roberts driving erratically. Officer Main smelled alcohol on Roberts' breath and suspected Roberts was driving while intoxicated but initially arrested Roberts only for operating a vehicle with a suspended license in violation of 29 M.R.S.A. § 2184. Officer Main handcuffed Roberts and then transported him to the Waterville Police Station for processing. Roberts remained in handcuffs throughout the relevant time period at issue in this case.

At the police station, Officer Main read Maine's "implied consent" form to Roberts, which is normally read to any driver stopped or arrested for operating under the influence of intoxicating liquor pursuant to 29 M.R.S.A. § 1312. The form states:

> By operating or attempting to operate a motor vehicle in this State you have a duty to submit to and complete chemical tests to determine your blood-alcohol level and drug concentration.
>
> I will give you a breath test unless I decide it is unreasonable, in which case another chemical test will be given. If you are requested to take a blood test you may ask that your physician perform the test if your physician is reasonably available.
>
> If you fail to comply with your duty to submit to and complete chemical tests your driver's license or permit or right to apply for or obtain a license will be suspended for at least 6 months and may be suspended as long as 3 years. Your failure to submit to a chemical test is admissible against you at any trial for operating while under the influence of intoxicating liquor or drugs.
>
> I have been advised of the consequences of failure to comply with the duty to submit to and complete a chemical test at the request of an officer and DO NOT WISH TO SUBMIT TO A TEST.

---

Signature of Person Refusing Test

Maine's implied consent form essentially tracks the language of the "implied consent" statute which requires officers to warn suspected drunk drivers of potential consequences of refusing to take the blood/alcohol test. 29 M.R.S.A. § 1312. As the statute was originally enacted, the only two consequences for failure to consent were, as the form states, suspension of the suspect's driver's license and the admission of the fact that the suspect refused to take the test in evidence at trial. In 1987, however, the Maine legislature amended its statute to provide two additional consequences, both involving sentencing, for refusing to take a blood/alcohol test. 1987 Maine Laws, ch. 791. Under

the current law, a defendant's refusal to submit to the test is considered to be an "aggravating factor" for the determination of that defendant's sentence and, more significantly, that defendant's refusal will result in a mandatory minimum sentence of 48 hours incarceration upon conviction. 29 M.R.S.A. § 1312-B(2) & (2)(B)(4).

Unfortunately, these changes did not make their way into the portion of the statute mandating what the police must say to suspected drunk drivers after those drivers are stopped. 29 M.R.S.A. § 1312(1). As a result, the "implied consent" form was never changed to reflect the additional consequences for refusing to submit to a blood/alcohol test. Likewise, during Roberts' processing at the police station, Officer Main never informed Roberts of the additional consequences, including the mandatory jail sentence.

During the period when Officer Main was administering the "implied consent" procedure to Roberts, Roberts asked several times to use the telephone for the purpose of calling his attorney. Officer Main refused to allow Roberts to do so. Officer Main claimed that he denied Roberts permission to contact his attorney because Roberts was uncooperative and shouting obscenities.

Roberts eventually refused to take the blood/alcohol test. He also refused to sign the "implied consent" form after the form was read to him. Subsequently, the police filed a criminal complaint against Roberts charging him, among other things, with operating a motor vehicle under the influence of intoxicating liquor ("OUI") and operating on a suspended license in violation of 29 M.R.S.A. § 1312-B and 29 M.R.S.A. § 2184 respectively.

After a trial in the Maine district court, Roberts was convicted on the OUI and operating on a suspended license charges. At sentencing, the court followed the requirements of 29 M.R.S.A. § 1312-B(2)(B)(4) and imposed the mandatory minimum 48-hour sentence of incarceration as a result of Roberts' refusal to take a blood/alcohol test.[1]

---

1. The court also imposed a 90-day license suspension and a fine for Roberts' conviction of the

Roberts appealed his conviction to the Kennebec County Superior Court and then to the Maine Supreme Judicial Court. Both appellate courts denied his appeal. Following remand for the imposition of sentence, Roberts initiated a Petition for Writ of Habeas Corpus in the United States District Court for the District of Maine. The Maine state trial court ordered the sentence of incarceration stayed pending the outcome of proceedings on the habeas corpus petition. The federal district court dismissed Roberts' habeas corpus petition on October 29, 1993. Roberts then brought this appeal.

## II. ANALYSIS

Roberts raises two related issues on appeal: (1) whether Officer Main's refusal to allow Roberts to call his attorney before deciding whether to take a blood/alcohol test denied Roberts of his Sixth Amendment right to counsel; and (2) whether Maine's "implied consent" form is misleading and inaccurate, in violation of Roberts' constitutional right to due process. Although Roberts' Sixth Amendment right to counsel is not implicated in this case, we do find a violation of Roberts' due process rights on the grounds that all of the circumstances of the case, including, but not limited to, the misleading information, deprived Roberts of fundamental fairness.

### A. *Sixth Amendment Right to Counsel*

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to ... have the Assistance of Counsel for his defense." U.S. Const. amend. VI. It is axiomatic that the right to counsel attaches only upon "the initiation of adversary judicial criminal proceedings" against the defendant, and thereafter the right applies to all "critical stages" of the prosecution, before, during and after trial. *United States v. Gouveia,* 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984); *United States v. Ash,* 413 U.S. 300, 310–13, 93 S.Ct. 2568, 2574–75, 37 L.Ed.2d 619 (1973); *Kirby v. Illinois,* 406 U.S. 682, 688–90, 92 S.Ct. 1877, 1881–83, 32 L.Ed.2d 411 (1972); *United*

*States v. Wade,* 388 U.S. 218, 225–27, 87 S.Ct. 1926, 1931–32, 18 L.Ed.2d 1149 (1967).

■ The initiation of adversary judicial proceedings is normally "by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882. In general terms, the point at which the right to counsel attaches is when "formal charges" have been initiated or when "the government has committed itself to prosecute." *Moran v. Burbine,* 475 U.S. 412, 430–32, 106 S.Ct. 1135, 1145–47, 89 L.Ed.2d 410 (1986); *Gouveia,* 467 U.S. at 189, 104 S.Ct. at 2298; *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882. "By its very terms, [the Sixth Amendment] becomes applicable only when the government's role shifts from investigation to accusation. For it is only then that the assistance of one versed in the 'intricacies ... of law,' ... is needed to assure that the prosecution's case encounters 'the crucible of meaningful adversarial testing.'" *Moran,* 475 U.S. at 430, 106 S.Ct. at 1146 (1986) (quoting *United States v. Cronic,* 466 U.S. 648, 656, 104 S.Ct. 2039, 2045, 80 L.Ed.2d 657 (1984)).

■ In the present case, state officials had not brought any formal charges against Roberts for drunk driving at the time Roberts refused to take the blood/alcohol test. The first state action that could conceivably resemble a formal charge, the filing of the criminal complaint against Roberts for OUI, did not occur until after Roberts refused to submit to the test. Thus, at the point when Roberts was denied his request to speak with his attorney, the government had not yet committed to prosecuting him for OUI, nor had the government shifted its role from that of investigation to accusation. We find, therefore, that Roberts' right to counsel had not attached at the time of the alleged violation of his Sixth Amendment rights. *See McVeigh v. Smith,* 872 F.2d 725 (6th Cir. 1989) (finding that the Supreme Court rejected the argument that a suspect's right to counsel attaches prior to taking a blood alcohol test in *Nyflot v. Minnesota Comm'r of Public Safety,* 474 U.S. 1027, 106 S.Ct. 586, 88 L.Ed.2d 567 (1985), in which the Supreme

substantive offenses of drunk driving and driving    with a suspended license.

Court dismissed an appeal raising the right to counsel argument for lack of substantial federal question); *Langelier v. Coleman,* 861 F.2d 1508, 1510 n. 3 (11th Cir.1988) (noting right to counsel had not yet attached when suspect was asked to take a blood/alcohol test).

■ We recognize the possibility that the right to counsel might conceivably attach before any formal charges are made, or before an indictment or arraignment, in circumstances where the " 'government had crossed the constitutionally significant divide from fact-finder to adversary.' " *United States v. Larkin,* 978 F.2d 964, 969 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1323, 122 L.Ed.2d 709 (1993) (quoting *United States Ex Rel. Hall v. Lane,* 804 F.2d 79, 82 (7th Cir.1986)). Such circumstances, however, must be extremely limited and, indeed, we are unable to cite many examples. *See Larkin,* 978 F.2d at 969 (citing *Bruce v. Duckworth,* 659 F.2d 776, 783 (7th Cir.1981), for the proposition that the government may not intentionally delay formal charges for the purpose of holding a lineup outside the presence of counsel). Overall, Supreme Court jurisprudence on the Sixth Amendment appears to allow for few exceptions to the bright-line rule that the right to counsel does not attach until the government initiates official proceedings by making a formal charge. *See United States v. Heinz,* 983 F.2d 609, 612–13 (5th Cir.1993) (interpreting *Gouveia,* 467 U.S. at 187–90, 104 S.Ct. at 2296–99, and other Supreme Court precedent as establishing a strictly formal test for determining the initiation of judicial proceedings as opposed to a more functional test based on whether the government had taken on an adversarial stance towards the defendant or whether the government had focussed its investigation on the defendant); *see also Moran,* 475 U.S. at 431, 106 S.Ct. at 1146 ("The clear implication of the holding [in *Maine v. Moulton,* 474 U.S. 159, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985) ], and one that confirms the teaching of *Gouveia,* is that the Sixth Amendment right to counsel does not attach until after the initiation of *formal charges.*") (emphasis added).

■ Roberts asserts that the special circumstances of this case establish a Sixth Amendment right to counsel. According to Roberts, the mandatory sentencing consequences of refusing to take the blood/alcohol test, combined with the misleading information provided by Maine regarding the consequences that would arise from his refusal to take the test and the denial of Roberts' request to call his attorney to clear up the misunderstanding, somehow transformed the normally investigatory testing procedure into an adversarial, quasi-prosecutorial, sentencing proceeding. Appealing as this argument may be, we must reject it. Whatever limited circumstances may exist in which the right to counsel attaches prior to a formal charge, it cannot include the circumstances in the present case because the police were still waiting for the outcome of their investigation—either from the results of the blood/alcohol test or from the fact of defendant's refusal to submit to the test—before deciding whether or not to bring charges against the defendant. The government had not yet crossed the constitutional divide between investigator and accuser. As a threshold matter, the right to counsel had not yet attached when Robert's request for counsel was denied, and, therefore, we cannot reach the further, and admittedly close, question of whether or not Roberts decision to take the blood/alcohol test involved a "critical stage" of the prosecution at which the right to have the advice of counsel would otherwise be constitutionally required.

## B. *Due Process*

We do find merit, however, in Roberts' claim that Officer Main's actions violated Roberts' right to due process. The combination of circumstances in this case presents a unique situation in which the state of Maine failed to meet the requirements of fundamental fairness.

■ The Due Process Clause of the Constitution prohibits deprivations of life, liberty, or property without "fundamental fairness" through governmental conduct that offends the community's sense of justice, decency and fair play. *Moran v. Burbine,* 475 U.S. 412, 432–34, 106 S.Ct. 1135, 1146–48, 89 L.Ed.2d 410 (1986); *United States v. Russell,*

411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *Hannah v. Larche,* 363 U.S. 420, 442, 80 S.Ct. 1502, 1514–15, 4 L.Ed.2d 1307 (1960); *Rochin v. California,* 342 U.S. 165, 172–73, 72 S.Ct. 205, 209–10, 96 L.Ed. 183 (1952); *United States v. Barnett,* 989 F.2d 546, 560 (1st Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 148, 126 L.Ed.2d 110 (1993). "Due process" is a flexible concept— "the processes required by the Clause with respect to the termination of a protected interest will vary depending upon the importance attached to the interest and the particular circumstances under which the deprivation may occur." *Walters v. National Ass'n of Radiation Survivors,* 473 U.S. 305, 320, 105 S.Ct. 3180, 3189, 87 L.Ed.2d 220 (1985). The test for determining whether state action violates the Due Process Clause, formally set out in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), requires a court to consider: (1) the private interest that will be affected by the government's action; (2) the risk of an erroneous deprivation of such interest through the existing procedure and the probable utility of additional or substitute procedural safeguards; and (3) the government's interest in adhering to the existing procedure, including fiscal and administrative burdens that additional procedures might entail. *Id.; Walters,* 473 U.S. at 321, 105 S.Ct. at 3189; *Mackey v. Montrym,* 443 U.S. 1, 10, 99 S.Ct. 2612, 2617, 61 L.Ed.2d 321 (1979); *In re Nineteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.,* 982 F.2d 603, 611 (1st Cir.1992).

■ We find that Officer Main's actions in this case deprived Roberts of liberty in a manner lacking in fundamental fairness and offensive to the universal sense of fair play. The police officer took Roberts into custody and, while Roberts was handcuffed at the police station, presented him with a choice that had irrevocable sentencing consequences involving a mandatory period of incarceration. Roberts was asked to take a blood/alcohol test and told that if he refused to submit to the test, his drivers license would be suspended and the fact of his refusal could be used against him at trial. Roberts was then informed that he had been "advised of the consequences of failure to comply." This statement was misleading because there is at least one additional consequence of failing to consent to a test: a 48–hour term of incarceration. Roberts was never told that his refusal to take the test could also result in a mandatory two-day jail sentence if he were to be convicted of driving under the influence of alcohol. Thus, Roberts was not informed of *"the* consequences" of failing to comply with the "implied consent" procedure.

■ Following Officer Main's reading of the "implied consent" form, Roberts asked to call his attorney before deciding whether or not to take the blood/alcohol test. Officer Main denied this request, despite the apparent absence of any inconvenience or unreasonable delay in allowing the phone call. If allowed to speak with his attorney, Roberts could have been informed of the sentencing consequences of a decision not to submit to the blood/alcohol test, thus clarifying the misleading information provided by Maine's "implied consent" form. The attorney could have also provided advice to Roberts at the only point during the process for determining Roberts' sentence when the mandatory consequences of the two-day term of incarceration could still be avoided. The attorney's advice would come too late at the sentencing hearing itself, at which time there is nothing the attorney can do to mitigate or rebut the imposition of the 48–hour jail term. Roberts thus had to make a decision with irrevocable consequences for his sentence after the state provided him with inaccurate information with which he was expected to make that decision. Under this combination of circumstances, it is incumbent upon the state to honor a reasonable request to call an attorney. Refusing to provide this simple safeguard violated Roberts' right to due process.

A review of the *Mathews* factors confirms our conclusion. The liberty interest deprived by the state's actions in this case is Roberts' freedom from the mandatory two-day jail sentence imposed because of the refusal to take a blood/alcohol test. Roberts' interest in freedom from incarceration is certainly worthy of substantial due process protections. *See, e.g., United States v. Salerno,* 481 U.S. 739, 750, 107 S.Ct. 2095, 2103, 95

L.Ed.2d 697 (1987); *Addington v. Texas,* 441 U.S. 418, 423–25, 99 S.Ct. 1804, 1807–09, 60 L.Ed.2d 323 (1979). In addition, Maine placed Roberts in a position where he was forced to make a decision between cooperating with investigators and suffering mandatory and irrevocable consequences for his subsequent sentencing. Cooperation in this case would probably have sealed Roberts' fate at trial but it also would have avoided certain harsher penalties. Roberts thus faced a situation similar in some respects to plea bargaining. As such, Maine's "implied consent" procedure implicates Roberts' right to receive fair treatment by the prosecution during plea bargaining. *Santobello v. New York,* 404 U.S. 257, 261–62, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971); *Brady v. United States,* 397 U.S. 742, 756–58, 90 S.Ct. 1463, 1473–74, 25 L.Ed.2d 747 (1970); *United States v. Bouthot,* 878 F.2d 1506, 1511 (1st Cir.1989).

■ Moreover, the mandatory sentencing consequences stemming from Roberts' refusal to take the blood/alcohol test injects important elements of sentencing procedure into the police investigation of a suspected OUI offense. Because Roberts can do nothing to contest the imposition of a 48–hour term of incarceration at the sentencing hearing itself, the critical point for calculating a key portion of Roberts' sentence essentially occurs at the time Roberts is requested to take the blood/alcohol test. Thus, this case implicates Roberts' interest in fair sentencing procedures. *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204–05, 51 L.Ed.2d 393 (1977); *United States v. Doe,* 655 F.2d 920, 927–28 (9th Cir.1980). We find, therefore, that Maine's actions towards Roberts implicate important liberty interests deserving of substantial due process protection.

Turning to the second consideration under *Mathews,* the risk of erroneous deprivation of the liberty interest and the probable value of an additional procedural safeguard, we find a strong due process justification for allowing Roberts to contact his attorney. Although Officer Main's refusal to allow Roberts to call his attorney did not significantly increase the risk that Roberts would be erroneously convicted of an OUI offense, the officer's conduct greatly increased the risk that a two-day jail sentence would be imposed on Roberts as a result of a decision made in reliance upon misleading information. The erroneous deprivation thus consists of attaching sentencing consequences to a choice that an individual may not have made had the state provided him or her with accurate information. In other words, absent the inaccurate information, the two-day jail term may not have been imposed.

We are faced here with a unique situation in which the sentencing consequences of incarceration are imposed not so much for the substantive criminal conduct itself but for the separate volitional act of refusing to cooperate with the investigation of that conduct. As such, an erroneous deprivation of liberty can result from a suspect's behavior under rather dubious circumstances, if not false pretenses, created by the state. In this case, Roberts might have chosen to cooperate and thus avoid the mandatory term of incarceration if he had been allowed to speak with his lawyer and correct the inaccurate information he received. Once Roberts' decision was made, however, there was nothing the attorney or judge could do at sentencing to remedy Roberts' tainted decision.

On the other side of the coin, there is much that allowing Roberts to call his attorney could do to safeguard against the type of erroneous deprivation of liberty at risk in this case. Plainly and simply, Roberts' attorney could have informed Roberts of the additional sentencing consequences of refusing to take the blood/alcohol test, thus correcting the state's misleading information. The attorney could also counsel Roberts on the advisability of cooperating to avoid the mandatory two-day sentence. This is the only point at which such counsel has any value; once the decision whether or not to submit to the test is made, the die is cast, and nothing the attorney can do at sentencing will mitigate the effect of the two-day sentence.

■ The present situation thus presents concerns analogous to those expressed by the Supreme Court in many of its right to counsel cases. *See Wade,* 388 U.S. at 224, 87 S.Ct. at 1931 (affording right to counsel at

critical pre-trial stages of proceedings "where the results might well settle the accused's fate and reduce the trial itself to a mere formality"); *Ash,* 413 U.S. at 315–16, 93 S.Ct. at 2576 (noting that "there were times when the subsequent trial would cure a one-sided confrontation between prosecuting authorities and the uncounseled defendant," rendering the absence of an attorney acceptable, but that there were other times when an attorney was required because there was no such "opportunity to cure defects at trial"); *Maine v. Moulton,* 474 U.S. 159, 170, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985); *see also Mempa v. Rhay,* 389 U.S. 128, 133, 88 S.Ct. 254, 256, 19 L.Ed.2d 336 (1967) (reviewing holding in *Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948), where the absence of counsel during sentencing combined with false assumptions about the defendant's criminal record was found to deprive the defendant of due process, and noting that the counsel in that case " 'might not have changed the sentence, but he could have taken steps to see that the conviction and sentence were not predicated on misinformation or misreading of court records, a requirement of fair play which absence of counsel withheld from this prisoner.' ") (quoting *Townsend,* 334 U.S. at 741, 68 S.Ct. at 1255). We therefore conclude that Maine's implied consent procedure presents a substantial risk of erroneous deprivation of liberty and that allowing Roberts to call his attorney is likely to alleviate the risk and, as such, is a valuable procedural safeguard.

Finally, we consider the state's interest in refusing to allow Roberts to call his attorney, including any administrative and fiscal burdens such a phone call would entail. There is nothing in the record to indicate that allowing Roberts to call his lawyer from the police station would impose on the police any meaningful burden whatsoever. On the contrary, Maine law allows for suspected drunk drivers to request their own physician to conduct the blood/alcohol test if reasonably available. 29 M.R.S.A. § 1312. Maine thus already contemplates making reasonable accommodations for drunk driving suspects. Allowing a simple phone call to an attorney is much less intrusive on the implied consent

process than arranging a medical procedure with the suspect's doctor.

Given the transient nature of the evidence in drunk driving cases—that is, the blood/alcohol level in a suspect's blood—the police may certainly proceed with the implied consent procedure if a delay would affect the test results or otherwise interfere with the testing procedure. The police may refuse to wait for a suspect who is unable to reach an attorney within a reasonable period of time or refuse to undertake time-consuming and burdensome efforts to contact an attorney who is not immediately available. There is no indication, however, that such was the case here. Officer Main testified that he did not allow Roberts to call his attorney because Roberts was uncooperative and shouting obscenities. We see no relevance of this fact to any state interest in refusing to allow Roberts to make a phone call before deciding whether or not to take the blood/alcohol test. We therefore find no significant state interest in refusing to allow Roberts to call his attorney that would justify what we consider to be a denial of due process.

To clarify, we do not discount Maine's interest in imposing an implied consent procedure to encourage the voluntary testing of drunk drivers, nor do we have any quarrel with Maine's desire to impose harsher penalties on those refusing to cooperate. We see very little interest, however, in denying a reasonable request at the police station to call an attorney, where that call could serve to clear up misleading information regarding the testing procedure provided by the state.

■ Furthermore, we do not find, in this case at least, that a suspected drunk driver has a due process right to contact an attorney whenever the state imposes mandatory sentencing consequences upon the refusal of the suspect to take a blood/alcohol test. Rather, we find that where the suspect makes a reasonable request to contact his or her attorney and the attorney can correct misleading information provided by the state at a point when the suspect must make a decision that is crucial for his or her subsequent sentencing, due process requires that the suspect's request be honored.

We are confronted with a substantially different situation in this case than the one that the Supreme Court considered in *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). In *Neville,* the Supreme Court held that the Due Process Clause was not violated when a police officer failed to warn a suspected drunk driver that his refusal to submit to a blood-alcohol test could be used against him at trial. The Court reasoned that because the drunk driver in that case was specifically warned that his refusal to submit to the test would result in the suspension of his license, the driver knew that his refusal "was not a 'safe harbor,' free of adverse consequences." *Id.* at 566, 103 S.Ct. at 924. The Court also noted that it was "unrealistic to say that the warnings given here implicitly assure a suspect that no consequences other than those mentioned will occur." *Id.*[2]

Unlike *Neville,* the present case is not a simple "failure to warn" situation involving a state's withholding of information that it was never required to provide. Rather, this is a case in which a mandatory sentence of incarceration is attached to a suspect's decision to take a blood/alcohol test, where the suspect is given misleading information that indicates no such sentence exists; and further, where that suspect is denied permission to speak to an attorney who could have cleared up the misunderstanding and who could have provided advice at the only point where the sentencing consequences could be avoided. The Supreme Court did not address the due process implications of these circumstances. Instead, *Neville* dealt with a quite different issue: the due process implications of a state's failure to warn about the use at trial of a suspect's refusal to take a blood/alcohol test. The differences between the two cases are stark.

First, *Neville* considered an interest of much lower magnitude than Roberts' liberty interest in freedom from incarceration. As the Supreme Court found, the use of the fact that a suspect refused to submit to a test as evidence against that suspect at trial does not implicate the suspect's Fifth Amendment right against self-incrimination. *Id.* at 558–64, 103 S.Ct. at 919–23. Thus, the suspect in *Neville* had no protectable liberty interest beyond the general right to a fair trial, a right which faced little risk of erroneous deprivation in that case. *Neville* did not involve a mandatory sentence that risked depriving an individual of the important liberty interest of freedom from incarceration, a liberty interest that is involved here.

Second, the consequence about which Maine failed to warn Roberts in the present case is irrevocable and irrebuttable, making the suggested procedural safeguard—permission to call an attorney—crucial to protecting Roberts' liberty interest. In the *Neville* case, however, the consequences involved an evidentiary disadvantage that could be rebutted, mitigated or otherwise explained by counsel at trial. The blood/alcohol test, therefore, was not the only point in *Neville* at which a procedural safeguard would have had any value.

Third, there is an additional element of unfairness in this case, not found in *Neville,* due to the misleading nature of the instructions given to Roberts. In the *Neville* case, the Supreme Court specifically noted that the suspect was given no implicit assurances that he was being warned of all the consequences of refusing to submit to testing, *id.* at 566, 103 S.Ct. at 924, whereas in this case, Roberts was told that he had been advised of "the consequences," incorrectly implying that there were no additional consequences. As a result, Roberts faced a greater risk of erroneous deprivation of his liberty than the suspect in *Neville.*

██ Due process may not require warnings of the consequences of refusing to take a blood/alcohol test, and it may not require a full right to counsel for suspects facing the decision whether or not to submit to testing. Under the circumstances of this case, however, as a matter of fair play and decency, due

---

**2.** The instructions given to the defendant in *Neville* contained no language resembling the misleading statement in this case that the suspect had been "advised of the consequences." The instructions in *Neville* merely informed the sus-

pect that if he refused to take a blood/alcohol test, his license could be suspended. The suspect was then merely asked: "Do you understand what I told you?" *Neville,* 459 U.S. at 555 n. 2, 103 S.Ct. at 918 n. 2.

process does require that Roberts be given a reasonable opportunity to call his attorney before deciding on whether to be tested.

### CONCLUSION

For the foregoing reasons, we find that the mandatory 48–hour jail sentence imposed on Roberts pursuant to § 1312–B(2)(B)(4) violates due process. The infirmities in the procedures surrounding Roberts' arrest did not, however, taint his underlying convictions for drunk driving and driving with a suspended license. *Accordingly, the judgment of the district court is reversed and the case is remanded to the district court with instructions to issue a writ of habeas corpus upon the failure of the State of Maine to vacate the mandatory 48–hour jail sentence imposed pursuant to § 1312–B(2)(B)(4) and to accord Roberts a sentencing hearing at which no minimum sentence is mandated.*

CYR, Circuit Judge (concurring).

Although I am pleased to concur in the result reached in the ably crafted majority opinion, I write separately on the due process claim.

On direct appeal, the Maine Supreme Judicial Court ("Law Court"), citing *State v. Plante,* 417 A.2d 991, 994 (1980) (pre-*Neville*), erroneously concluded that "the right to a warning of the consequences of refusing a chemical test is not one of constitutional dimensions." *State v. Roberts,* 609 A.2d 702, 703 (Me.1992).[3] The district court below likewise erred in ruling that a "requirement that a driver submit to a chemical test does

not *implicate* the due process clause of the Constitution," *Roberts v. Maine,* No. 93–0154–B, slip op. at 3 (D.Me. Sept. 24, 1993) (magistrate-judge's proposed findings and recommendation), *aff'd,* slip op. at 1 (D.Me. Oct. 27, 1993) (emphasis added). Consequently, neither court reached Roberts' due process claim.

The Law Court premised its conclusion in large part on *South Dakota v. Neville,* 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983). *See Roberts,* 609 A.2d at 703 ("the [*Neville*] Court reasoned that allowing the suspect to choose whether to submit to testing is 'a matter of legislative grace' bestowed by the state legislature and thus, not subject to constitutional protections."). However, the statement relied on by the Law Court related to Neville's Fifth Amendment self-incrimination claim, not the due process claim. *See infra* at p. 1297. The *Neville* Court explicitly qualified its statement so as to obviate any intimation that penalties for refusing to submit to chemical testing are beyond the scope of the Due Process Clause. *Neville,* 459 U.S. at 560, 103 S.Ct. at 920 ("Such penalty for refusing to take a blood-alcohol test is unquestionably legitimate, *assuming appropriate procedural safeguards.*") (emphasis added).[4]

The constitutional underpinnings for the more recent Supreme Court pronouncements on "implied consent" procedures stem from *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). *See Nyflot v. Minnesota Comm'r of Pub. Safety,* 474 U.S. 1027, 1027–29, 106 S.Ct. 586, 586–88, 88

---

**3.** Under 28 U.S.C. § 2254, we accord *de novo* review to state court rulings on federal constitutional issues, *Wellman v. Maine,* 962 F.2d 70, 72 (1st Cir.1992), as well as to mixed questions of fact and law, *id.* ("Federal court may give different weight to the facts as found by the state court and may reach a different conclusion in light of the legal standard") (quoting *Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306–07, 71 L.Ed.2d 480 (1982)). *See also Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1492, 84 L.Ed.2d 494 (1985) ("minimum procedural requirements are a matter of federal law, they are not diminished by the fact that the State may have specified its own procedures that it may deem adequate for determining the preconditions to adverse official action.").

**4.** Indeed, the *Plante* case itself, upon which the Law Court directly relied in *Roberts,* 609 A.2d at 703, involved a self-incrimination claim as well. *See Plante,* 417 A.2d at 994. Viewed in context, the statement that an OUI suspect's "right to refuse" testing is "simply a matter of grace bestowed by the ... Legislature," *Neville,* 459 U.S. at 565, 103 S.Ct. at 923, was meant merely to emphasize that the *right to refuse* testing, *unlike the right to silence* underlying *Miranda* warnings, is not of "constitutional dimension." *Id.* Thus, *Neville* in no sense eroded the "constitutional dimension" inherent in the traditional procedural safeguards attending deprivations of protected liberty interests. *Id.* at 560, 103 S.Ct. at 920–21. *See Mackey v. Montrym,* 443 U.S. 1, 17–19, 99 S.Ct. 2612, 2620–22, 61 L.Ed.2d 321 (1979).

L.Ed.2d 567 (1984) (summary dismissal for want of substantial federal question) (opinion of White, J., dissenting from summary dismissal); *Neville*, 459 U.S. 553, 103 S.Ct. 916; *see also Mackey v. Montrym,* 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979); *Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977); *Bell v. Burson,* 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971); *Breithaupt v. Abram,* 352 U.S. 432, 77 S.Ct. 408, 1 L.Ed.2d 448 (1957). *Schmerber* held the Fifth Amendment privilege against self-incrimination inapplicable because blood-alcohol level testing ("chemical testing"), albeit a Fourth Amendment search and seizure, simply yields real or physical evidence as distinguished from "testimonial" evidence. *Schmerber,* 384 U.S. at 765, 86 S.Ct. at 1832–33. Accordingly, the State may *force* a non-consenting suspect to submit to a reasonable chemical test under exigent circumstances, without a warrant, provided there is probable cause to arrest the suspect for "operating under the influence" ("OUI"). *Id.* at 766–72, 86 S.Ct. at 1833–37. And since alcohol and drugs are evanescent substances inexorably metabolized by the body, the "exigent circumstances" requirement is almost invariably met by the urgent need to test before a warrant can be obtained. *Id.* at 770–71, 86 S.Ct. at 1835–36.

Years later, in *Neville,* the Supreme Court rejected *two distinct* constitutional challenges to an "implied consent" statute which empowered South Dakota to introduce into evidence an OUI suspect's refusal to submit to chemical testing. First, the Court held that the Fifth Amendment right against self-incrimination was never *implicated* because the State did not impermissibly coerce the refusal. *Neville,* 459 U.S. at 562–64, 103 S.Ct. at 921–23. Second, and more to the present point, the Court rejected Neville's substantive due process claim premised on *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). *Neville,* 459 U.S. at 564–66, 103 S.Ct. at 922–24. Even though Neville was not warned that his refusal to submit to chemical testing could be offered against him at trial, and notwithstanding the fact that the police had advised him that his *silence* could not be used against him, *see Miranda v. Arizona,* 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966), the Supreme Court nevertheless found no "misleading implicit assurances" that the refusal to be tested would not be introduced in evidence, since "the warning that [Neville] could lose his driver's license made it clear that refusing the test was not a 'safe harbor,' free of adverse consequences." *Neville,* 459 U.S. at 565–66, 103 S.Ct. at 923–24. *Neville* thus upheld the power of the State to penalize refusals to submit to chemical testing, but explicitly conditioned its exercise on the availability of "*appropriate procedural protections.*" *Id.*

The procedural due process analysis appropriate to the present context contrasts starkly with the substantive due process analysis in *Neville,* where the only unwarned adverse consequence was that the State ultimately *might* be allowed to request the trier of fact, at trial, to infer that the refusal to be tested constituted evidence of his consciousness of guilt (intoxication). *See* S.D.Codified Laws § 32–23–10.1. (1980) ("such refusal *may be admissible*" in evidence at trial.) In such a setting, a defendant would be afforded the full panoply of procedural protections available *at trial.* First, the State's evidentiary proffer of the refusal to be tested would be subject to objection by the defendant; for example, on grounds that it did not evince the suspect's consciousness of guilt but mere confusion as to his legal rights. *See* Fed. R.Evid. 401, 403. Second, if the refusal were admitted in evidence, the defendant would be allowed to introduce evidence to rebut any "consciousness of guilt" inference. Finally, the trier of fact would be permitted, and could *not* be required, *see Carella v. California,* 491 U.S. 263, 265, 109 S.Ct. 2419, 2420, 105 L.Ed.2d 218 (1989) (per curiam); *Sandstrom v. Montana,* 442 U.S. 510, 514, 99 S.Ct. 2450, 2454, 61 L.Ed.2d 39 (1979), to infer "consciousness of guilt," but only to consider it, along with all other evidence, in determining whether the defendant was guilty beyond a reasonable doubt. Thus, in *Neville,* no unwarned consequence flowed inexorably from the refusal to be tested. All conventional trial procedures for barring and rebutting the refusal evidence remained available,

including the right to defend against it on the issue of guilt.

On the other hand, no *meaningful* procedure remained for Roberts to defend against the term of confinement mandated upon conviction for OUI as a consequence of the unwarned refusal to be tested. *See Mempa v. Rhay,* 389 U.S. 128, 133–34, 88 S.Ct. 254, 256–57, 19 L.Ed.2d 336 (1967) (sentencing is critical stage in criminal process); *see also Palmer v. City of Euclid,* 402 U.S. 544, 546, 91 S.Ct. 1563, 1564–65, 29 L.Ed.2d 98 (1971) (per curiam); *cf. Burns v. United States,* 501 U.S. 129, 137–39, 111 S.Ct. 2182, 2187, 115 L.Ed.2d 123 (1991) (even where sentencing court is vested with explicit sentencing discretion, *sua sponte* upward departure—absent prior notice to defendant—raises serious due process concerns).

Under the Maine "implied consent" procedure, *see* 29 M.R.S.A. §§ 1312, 1312–B (Supp.1994) (collectively: "section 1312"), the suspect is never warned that refusal to be tested entails a mandatory minimum sentence upon conviction for OUI. No matter how compelling or innocent the suspect's reason for refusing to be tested, *see, e.g., Jamros v. Jensen,* 221 Neb. 426, 377 N.W.2d 119, 123 (1985), the sentencing court must impose a minimum term of confinement, without regard to whether either the trier of fact or the sentencing judge ascribes the slightest "consciousness of guilt" to the suspect's refusal to be tested. Thus, in due process terms Maine's standard "implied consent" procedure differs *essentially* from the process upheld in *Neville,* particularly with respect to the absence of adequate predeprivation notice *and* a meaningful opportunity to be heard. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985).

The State need not acquiesce in an OUI suspect's refusal to submit to testing under an "implied consent" statute. *Schmerber,* 384 U.S. at 770–71, 86 S.Ct. at 1835–36. But once it opts to allow suspects to refuse chemical testing, it may not disregard procedural due process constraints under the Four-

teenth Amendment by depriving suspects of their protected liberty interest in remaining free from incarceration, without affording *either* adequate predeprivation notice *or* meaningful postdeprivation process. *See Loudermill,* 470 U.S. at 541, 105 S.Ct. at 1493 ("While the legislature may elect not to confer [an interest], it may not constitutionally authorize the deprivation of such an interest, once conferred, without appropriate procedural safeguards.")

The majority opinion in the present case essentially relies on a *Doyle*-based substantive due process analysis, *see Doyle,* 426 U.S. at 617–19, 96 S.Ct. at 2244–45, in concluding that it was fundamentally unfair for the State of Maine to subject Roberts to an unwarned mandatory minimum term of confinement for refusing to be tested. *See supra* pp. 1291–92. Although I am in substantial agreement with its substantive due process analysis, particularly that the warnings given Roberts included seriously "misleading implicit assurances"—a subject neither reached by the Law Court nor discussed by the district court—it is less clear to me that a substantive due process analysis is appropriate following *Albright v. Oliver,* —— U.S. ——, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

Even though the Fourteenth Amendment affords both substantive and procedural due process protections, the Supreme Court cautioned in *Albright* that "where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process must be the guide for analyzing these claims." *Id.* at ——, 114 S.Ct. at 813. In the present context, therefore, *Albright* appears to require at least *initial* resort to the procedural due process jurisprudence having particular application to similar proceedings. *See Mackey,* 443 U.S. at 10–19, 99 S.Ct. at 2617–22 (applying procedural due process analysis to license suspension for refusal to submit to chemical testing).[5]

---

5. Were it otherwise, however, it should be noted that "fundamental fairness" was disserved in the instant case by the presence of an important

factor *specifically found absent* in *Neville,* 459 U.S. at 563–64, 103 S.Ct. at 922–23. That is, the Maine "implied consent" advisory, whether by

The cornerstone regimen for identifying the particular process appropriate to deprivations of life, liberty or property is limned in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

Identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335, 96 S.Ct. at 903.

Under section 1312–B(2)(B)(4) (1987), a person convicted as a first-time OUI offender *must serve* not less than a two-day term of confinement if he refused to submit to chemical testing. Maine alone mandates a minimum term of confinement upon conviction for

design or inadvertence, assuredly has the *effect* of "subtly coerc[ing] [suspects] into choosing the option [*viz.,* refusal to be tested] that the State ha[s] no right to compel, rather than offering a *true* choice." *Id.* (emphasis added). *Cf. Roberts,* 609 A.2d at 703 n. 1 ("As in *Neville,* the warnings provided in this case were not *designed* to "trick" the defendant into refusing a test, then using the refusal against him at trial.") (emphasis added). As the Supreme Court excepted such subtle coercion from the sweep of its ruling rejecting Neville's Fifth Amendment claim against self-incrimination, *Neville,* 459 U.S. at 566, 103 S.Ct. at 924, this factor too would weigh *heavily* against the Maine "implied consent" advisory under any substantive due process analysis which may remain open following *Albright. See Albright,* —— U.S. at ——–——, 114 S.Ct. at 820–21 (Souter, J., concurring) (due process clause affords protections not directly addressed by more particular constitutional provision).

Under either a procedural or substantive due process analysis, however, the State may not deprive a person of the core liberty interest in remaining free from incarceration, without affording *either* adequate advance notice *or* meaningful post-refusal process, by imposing a mandatory minimum term of confinement upon an unwarned suspect for electing to accept a state-tendered option to refuse chemical testing. *Cf. Burns,* 501 U.S. at 137–39, 111 S.Ct. at 2187; *Neville,* 459 U.S. at 563, 103 S.Ct. at 922 (noting that it is legitimate for the State to *"offer* [the] option of refusing the test, *with the attendant*

OUI after failing to submit to chemical testing, yet inexplicably withholds from its standard "implied consent" advisory any mention of the mandatory minimum term of confinement attending the refusal to submit. *See supra* p. 1289.[6]

The standard advisory contemplates that the police provide two *explicit* warnings before requesting an OUI suspect to submit to chemical testing. First, the suspect is to be informed that refusal to be tested will result in an administrative suspension of motor vehicle operating privileges for not less than six months nor more than three years. *Id.* § 1312(1) (first offense). Second, the police "should also inform the [suspect] that the failure to comply with the duty to submit to a chemical test is admissible in evidence" at a subsequent OUI trial. *Id.* Although a failure so to inform the suspect does not render any chemical-test result inadmissible, *see id.,* no sanction omitted from the standard advisory can be imposed upon the accused, *except the mandatory minimum sentence at issue in this appeal. See id.* § 1312(1), (2), (8).[7]

*penalties for making that choice."*) (emphasis added).

6. The police are required to read a standard advisory to the OUI suspect, *see Roberts,* 609 A.2d at 703, and *no more, see id.* at 704. The Law Court concluded that it is "without authority to expand the warning to encompass the full range of potential penalties," *id.,* and we are bound by its interpretation of the Maine statute, *see Ortiz v. Dubois,* 19 F.3d 708, 713 n. 5 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 739, 130 L.Ed.2d 641 (1995). Thus, the omission of the mandatory minimum sentence from the standard advisory plainly originates in section 1312.

7. Section 1312(1) states:

Before any test specified is given, the law enforcement officer shall inform the person as to whom there is probable cause that, if the person fails to comply with the duty to submit to and complete the required chemical tests at the direction of the law enforcement officer, that person's license ... will be suspended for a minimum of 6 months and may be as long as 3 years. The officer should also inform the person that the failure to comply with the duty to submit to a chemical tests (sic) is admissible in evidence against that person at any trial for operating under the influence of intoxicating liquor or drugs.

Among the other forty-nine states, only four impose *any nonadministrative* sanction for refusing chemical testing. Two states, New York and New Jersey, prescribe mandatory minimum civil fines following an adjudication in a *separate* proceeding, based on an independent showing that the suspect failed to submit to chemical testing. *See* N.Y.Veh. & Traf.Law § 1194(2)(c) (1994) (separate *administrative* proceeding); N.J.Stat.Ann. § 39:4–50.4a (1994) (separate *judicial* proceeding). *See also State v. DiSomma*, 262 N.J.Super. 375, 621 A.2d 55 (App.Div.1993).[8] Three states, Alaska, Minnesota and Nebraska, have made it a *separate criminal offense* to refuse to submit to chemical testing, *but only if* the suspect was so informed at the time the request to submit was made. *See* Ak.Stat.Ann. § 28.35.032(a) (1994) ("after being advised ... that the refusal is a crime"); Minn.Stat. § 169.123(b) (1994) ("At the time the test is requested, the person shall be informed ... that refusal to take a test is a crime."); Neb. Rev.Stat. § 60–6,197(10) (1993) ("Any person who is required to submit to a ... chemical blood test ... shall be advised of (a) the consequences of refusing to submit to such test or tests...."); *see also Jamros*, 377 N.W.2d at 123 (holding that defendant cannot be convicted unless forewarned that refusal to submit is separate crime).

In sum, then, section 1312, unlike the "implied consent" procedure in any other state, *neither* criminalizes the refusal to submit to chemical testing *nor* contemplates that the suspect be forewarned that a criminal penalty, let alone a mandatory minimum term of confinement, may attend the refusal.

Absent adequate notice that particular conduct has been criminalized, a person may not be convicted or punished for it. *See Bouie v. City of Columbia*, 378 U.S. 347, 361–63, 84 S.Ct. 1697, 1706–08, 12 L.Ed.2d 894 (1964) (failure to afford notice that statute criminalized particular activity); *Wright v. Georgia*, 373 U.S. 284, 293, 83 S.Ct. 1240, 1246, 10 L.Ed.2d 349 (1963) (same); *Lambert v. California*, 355 U.S. 225, 227, 78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1957) ("Notice is required before property interests are disturbed, before assessments are made, before penalties are assessed."). As a general rule, of course, publication of a criminal statute affords adequate notice to the public at large. *Cheek v. United States*, 498 U.S. 192, 199, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991) ("Based on the notion that the law is definite and knowable, the common law presumed that every person knew the law."). And, of course, the common-law rule—that every person is presumed to know the law—not only *applies* in criminal cases, *United States v. International Mins. & Chem. Corp.*, 402 U.S. 558, 563, 91 S.Ct. 1697, 1700–01, 29 L.Ed.2d 178 (1970), but has prompted little concern in the usual course.

The common-law rule would be perverted, however, were it used to shield from constitutional challenge a deceptive State advisory that is delivered directly to the individual suspect and implicitly undermines any constructive notice presumptively afforded by publication. *See Raley v. Ohio*, 360 U.S. 423,

---

No test results may be excluded as evidence in any proceeding before any administrative officer or court of this State as a result of the failure of the law enforcement officer to comply with this prerequisite. The only effects of the failure of the officer to comply with this prerequisite are as provided in subsections 2 and 8.

Section 1312(2) states in relevant part:

Any suspension in effect shall be removed if, after hearing, it is determined that the person who failed to submit to the test would not have failed to submit but for the failure of the law enforcement officer to give either or both of the warnings required by subsection 1.

Section 1312(8) states in relevant part:

If the law enforcement officer ... fails to give either of the warnings required under subsection 1, the failure of the person to comply with the duty to submit to the chemical tests shall not be admissible, except when a test was required pursuant to subsection 11, paragraph D [testing after an accident involving death].

**8.** Under New Jersey law, the mandatory $250 civil fine is to be imposed following a separate judicial proceeding, but only if the suspect was so informed prior to refusing testing. N.J.Stat. Ann. § 39:4–50.2. Under New York law, a mandatory minimum $250 fine is to be imposed, following a separate administrative proceeding, provided the suspect was forewarned that refusal to be tested may result in a license suspension. N.Y.Veh. & Traf.Law § 1194(2)(c).

438–39, 79 S.Ct. 1257, 1266–67, 3 L.Ed.2d 1344 (1959); *see also Griffin v. Wisconsin,* 483 U.S. 868, 875 n. 3, 107 S.Ct. 3164, 3169 n. 3, 97 L.Ed.2d 709 (1987) (citing *Lambert,* 355 U.S. at 228, 78 S.Ct. at 242) ("If the regulation in question established a standard of conduct to which the probationer had to conform on pain of penalty—e.g. a restriction on his movements—*the state court could not constitutionally adopt so unnatural an interpretation of the language that the regulation would fail to provide adequate notice.*") (emphasis added). Accordingly, in my view, constructive notice by publication cannot insulate from procedural due process challenge the deceptive assurances the standard "implied consent" form instructs the police to communicate directly to the suspect immediately prior to the decision to refuse to submit to chemical testing. *See Raley,* 360 U.S. at 438–39, 79 S.Ct. at 1266–67.

The Supreme Court made clear in *Neville,* 459 U.S. at 566, 103 S.Ct. at 924, that courts should be *realistic* in their assessment of the context in which the allegedly misleading assurances are communicated to the suspect. It would be unrealistic in the extreme to suggest that a suspect in custody, whose only *actual knowledge* comes directly from the police in the form prescribed by law, nonetheless must be deemed on notice that the police advisory incorrectly states the *actual* consequences of refusing to be tested.[9] *See Raley,* 360 U.S. at 438–39, 79 S.Ct. at 1266–67 (Although the Commission gave erroneous

advice to the witnesses, "the fact remains that at the inquiry [it was] the voice of the State *most presently speaking to the appellants.*") (emphasis added); *see also supra* notes 8 & 9. Implicit in any such unrealistic assessment is the premise that a suspect in custody—denied access to counsel and totally dependent upon the State for the integrity of the implied consent advisory—should be presumed to have had not merely *constructive notice,* but the requisite *actual knowledge* of the procedural provisions of the "implied consent" statute that *alone might* alert him, *but see infra* note 13, to the criminal sanction attendant to a refusal to submit to testing. *See supra* note 5.

The standard "implied consent" advisory, naturally interpreted, *see Griffin,* 483 U.S. at 875, n. 3, 107 S.Ct. at 3169, n. 3, realistically and in context, *see Neville,* 459 U.S. at 566, 103 S.Ct. at 924, *undermines* whatever constructive notice might normally be presumed from mere publication of section 1312. *See Raley,* 360 U.S. at 438–39, 79 S.Ct. at 1266–67.[10] The Court in *Raley* concluded that certain witnesses had been convicted without due process "for exercising a privilege which the State clearly had *told* [them] was available...." *Id.* at 438, 79 S.Ct. at 1266 (emphasis added). The Court even reversed the conviction of another witness, Brown, who was *never advised* that a privilege existed, but whose attempts to assert privilege had been facilitated by the Commission.[11] *Id.* at

---

9. A compelling public interest normally warrants invoking the common-law presumption of constructive notice based on publication; quite simply, there is no practicable alternative. *See International Mins. & Chem. Corp.,* 402 U.S. at 563, 91 S.Ct. at 1701 ("The principle that ignorance of the law is no defense applies whether the law be a statute or a duly promulgated and published regulation.") But where the only purpose served by the presumption is to perpetuate a seriously flawed "implied consent" advisory that is inherently unfair to the suspect and counterproductive to any *legitimate* State interest, due process must be first served. *See infra* pp. 1303–05.

10. In *Raley,* certain witnesses were advised by the Ohio Un–American Activities Commission, a creature of the Ohio Legislature, that they were entitled to assert a state-created privilege against self-incrimination. *Raley,* 360 U.S. at 424–25, 79 S.Ct. at 1259–60. The Commission advisory was inaccurate, however, as an Ohio statute con-

ferred automatic transactional immunity upon witnesses in return for their testimony. *Id.* at 431, 79 S.Ct. at 1263 (quoting Ohio Rev.Code § 101.44). After the witnesses were convicted of criminal contempt of the Ohio Legislature for refusing to answer questions put by its Commission, *id.* at 432, 79 S.Ct. at 1263, the United States Supreme Court set aside their convictions as violative of the Due Process Clause of the Fourteenth Amendment. *Id.* at 437, 79 S.Ct. at 1265–66.

11. Significantly, the Commission permitted Brown to utilize a "shorthand" method for claiming privilege, *id.* 360 U.S. at 430–31, 79 S.Ct. at 1262 ("the Chairman's concern [as to whether Brown was asserting privilege] is inexplicable on any other basis than that he deemed the privilege available at the inquiry, and his statements would tend to create such an impression in one appearing at the inquiry"), without

430, 79 S.Ct. at 1262. *See Neville*, 459 U.S. at 566, 103 S.Ct. at 924 (leaving open the possibility that the State might "unfairly trick" a person with an "implicit promise"); *cf. Cox v. Louisiana*, 379 U.S. 559, 571, 85 S.Ct. 476, 484, 13 L.Ed.2d 487 (1965) (vacating convictions, as violative of procedural due process, on grounds that defendants had been advised by police officials that picketing was permitted at the arrest site).

Similarly, the standard "implied consent" advisory challenged by Roberts conveys not merely a "mixed message," *see United States v. Smith*, 940 F.2d 710, 715 (1st Cir.1991), but one likely to befuddle a Philadelphia lawyer. While it requires the police to advise the suspect that he has the duty to submit to testing, *it also requires that the suspect be told that he may elect not to submit to testing*, subject only to certain administrative and evidentiary consequences. Although it is conceivable that *"lesser* included" sanctions for refusing testing might be encompassed within *Neville's* "no safe harbor" rationale, *see Neville*, 459 U.S. at 565–66, 103 S.Ct. at 923–24, Maine's standard advisory could only be salvaged on the counterintuitive theory that notice of the lesser sanction should be deemed to encompass the *greater*—both in terms of severity and constitutional dimension—thereby abandoning

the central constitutional concern for *meaningful* process. *See Armstrong v. Manzo*, 380 U.S. 545, 551, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (due process clause envisions that the process due be accorded "at a meaningful time and in a meaningful manner"); *Raley*, 360 U.S. at 438, 79 S.Ct. at 1266; *cf. United States v. Cardiff*, 344 U.S. 174, 176–77, 73 S.Ct. 189, 190, 97 L.Ed. 200 (1952) ("We cannot sanction taking a man by the heels for refusing to grant the permission which this Act on its face apparently gave him the right to withhold. That would be making an act criminal without fair and effective notice.") (overturning criminal conviction for refusing admittance to government inspector in reliance on regulatory provision that appeared to confer right to refuse).[12]

Although the standard "implied consent" advisories on the administrative (license suspension) and evidentiary (admission of test refusal) sanctions for refusing testing afford fair notice that refusal is "not a safe harbor", *Neville*, 459 U.S. at 566, 103 S.Ct. at 924, *Neville* does not insulate from constitutional challenge state-prescribed advisories that actively instigate the natural and realistic interpretation that no sanction more serious than the warned sanctions will attach to the suspect's refusal to submit to testing.[13] *See,*

---

informing him that the claim was invalid, *id.* at 431–32, 79 S.Ct. at 1262–63.

**12.** The Law Court observed that § 1312 was not *designed* to trick Roberts into refusing to be tested. *Roberts*, 609 A.2d at 703 n. 1, ("As in *Neville*, the warnings provided in [Roberts'] case were not designed to "trick" the defendant into refusing a test, then using the refusal against him at trial.") Supreme Court case law makes clear, however, that where an "established state procedure" deprives a person of a protected liberty interest without appropriate safeguards, a violation of procedural due process obtains. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982); *see also Raley*, 360 U.S. at 438, 79 S.Ct. at 1266 ("While there is no suggestion that the Commission had any intent to deceive the appellants, ... to sustain the judgment of the Ohio Supreme Court on such a basis after the Commission had acted as it did would be to sanction the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him.")

**13.** The standard "implied consent" advisory presents suspects with a deceptive choice in two vital respects. First, the suspect is never informed of the most serious, unmitigable, and irremediable sanction for refusing to be tested. Second, were the State to choose to force testing upon the suspect notwithstanding his refusal, it is far from clear that the "option" of refusal would avail the suspect anything other than a mandatory minimum sentence. *Compare* Me. Rev.Stat.Ann. tit. 29, § 1312 (1987) *with* Me.Rev. Stat.Ann. tit. 29, § 1312(2) (Supp.1985–86).

Unlike the defendant in *Smith*, 940 F.2d at 715 (rejecting entrapment-by-estoppel claim), there is no suggestion that Roberts had any *knowledge* that the "no-test" option tendered by the arresting officer was punishable by a mandatory term of confinement. The *Smith* court reasoned that an alleged "mixed message" from a police officer "could not have reasonably invited [the defendant's] reliance ..." because it was never claimed that the officer informed Smith that his conduct was lawful. *Id.* at 715. In the present case, however, reliance upon the deceptive advisory was plainly reasonable. The alternative conclusion would be either that the information

*e.g., Raley,* 360 U.S. at 425, 79 S.Ct. at 1259–60. Furthermore, by instructing the police to bait the "no-test" option with the implicit assurance that "the consequences" for refusing chemical testing are noncriminal in nature, *see supra* p. 1299, the standard advisory seems well suited to snare even the most wary suspect. After all, rarely in the experience of courts, let alone ordinary citizens, are law enforcement officers cast as exclusive advisors to custodial suspects concerning a state-tendered option *not* to perform an implied duty, and then instructed to warn individual suspects of the noncriminal sanctions for abjuring their duty, *without mentioning the criminal consequences.* Under no natural interpretation of the standard advisory is it fair to say that a suspect is afforded *meaningful pre-*refusal notice of the mandatory minimum sentence.[14] *See Raley,* 360 U.S. at 438–39, 79 S.Ct. at 1266–67; *cf. Reich v. Collins,* —— U.S. ——, —— – ——, 115 S.Ct. 547, 550–51, 130 L.Ed.2d 454 (1994) (denial of procedural due process results where statute, naturally read, allowed citizen choice between predeprivation or postdeprivation challenge to tax assessment, but state supreme court disallowed postdeprivation review after citizen had elected to prepay tax assessment).

A coordinate procedural safeguard under the Due Process Clause dictates that any opportunity to be heard shall be provided "at a meaningful time and in a meaningful manner." *Armstrong,* 380 U.S. at 552, 85 S.Ct.

at 1191. As there is no *meaningful post-*refusal opportunity to be heard on the imposition of the mandatory minimum sentence under section 1312, and no suggestion that the state sentencing court contemplated a two-day term of confinement irrespective of the mandated minimum imposed pursuant to section 1312–B(2)(B)(4), I can only conclude that the process accorded Roberts violated fundamental notions of procedural due process.[15]

Finally, the analyses contemplated by the Supreme Court in *Mathews,* 424 U.S. at 335, 96 S.Ct. at 903, clearly indicate that all appropriate process can be accorded under section 1312 simply by adding a few words to the standard "implied consent" advisory.

### (i) *The Private Interest*

The core liberty interest Roberts asserts in remaining free from incarceration is entitled to full procedural due process protection. *See Board of Regents v. Roth,* 408 U.S. 564, 571–72, 92 S.Ct. 2701, 2706–07, 33 L.Ed.2d 548 (1972); *Bowie,* 378 U.S. at 362, 84 S.Ct. at 1707 (overturning criminal conviction obtained through procedural due process violation); *Wright,* 373 U.S. at 287, 83 S.Ct. at 1242–43 (same).

### (ii) *The Risk of Erroneous Deprivation*

The risk that an erroneous deprivation of liberty will occur is roughly commensurate

actually provided the suspect at the scene is immaterial, *but see id.,* or that constructive notice of the statutory language trumps the knowledge actually acquired by the suspect from the police officer at the scene. *But see Raley,* 360 U.S. at 438–39, 79 S.Ct. at 1266–67.

**14.** Moreover, under the rule of lenity, any ambiguity in the standard "implied consent" advisory must be resolved in favor of the accused. *See United States v. Kozminski,* 487 U.S. 931, 952, 108 S.Ct. 2751, 2764, 101 L.Ed.2d 788 (1988) (identifying purposes underlying rule of lenity as: the promotion of fair notice "to those subject to the criminal laws, minimiz[ing] the risk of selective or arbitrary enforcement, and ... maintain[ing] the proper balance between [the legislature], prosecutors and courts....").

**15.** It is neither plausible to suggest, nor discernible from the record, that the mandatory minimum term of confinement was imposed simply

as punishment for the underlying OUI offense. First, the mandatory minimum sentence was not preordained by the OUI conviction but by the unwarned refusal to submit to testing in the moments following the arrest. Although it is preconditioned on an OUI conviction, all meaningful discretion on the part of the sentencing court is withdrawn as an unwarned consequence of the defendant's noncriminal refusal to submit to testing. Second, no mitigating circumstances, either in relation to the refusal to be tested or the commission of the underlying offense, can enable the court to sentence below the mandatory minimum. Third, the statutory description of the mandatory minimum sentence for refusing testing—as an "aggravating factor," *see* § 1312–B(2) ("refusal to submit to a chemical test shall in every case be an aggravating factor")—is itself a *misleading euphemism* for what is in reality a *conclusive sentencing mandate* which the court is *required* not merely to consider but to impose without regard to any mitigating circumstance.

with the relevance the unwarned consequence bears ·to the decision to refuse testing. ˙The unwarned mandatory term of confinement—the most serious consequence— surely bears great relevance to the "no-test" decision; even a presumptively determinative relevance in the present circumstances.

Significant, derivative risks attach to the inaccurate advisory as well. No doubt there are many first-time OUI suspects with neither the knowledge nor the experience to assess whether their blood-alcohol content exceeds the *prima facie* intoxication level prescribed by statute. For such suspects, at least, it cannot be claimed that an accurate advisory on the mandatory minimum term of confinement attendant upon a refusal to submit to testing would not materially influence their decision. Thus, the deceptive "implied consent" advisory not only risks erroneous *conviction* (*e.g.*, as a consequence of allowing an unwarned refusal in evidence where chemical testing may have revealed a blood-alcohol content below the *prima facie* level) but a *sentence* more severe than would have been imposed by the court but for the suspect's unwarned refusal to be tested (*e.g.*, where reliable test results would have disclosed a blood-alcohol content below the *prima facie* intoxication level).

The undeniable value of a ready alternative to the deceptive advisory is obvious. The legitimate interests of the State, as well as the accused, would be significantly advanced by the simple inclusion of a straightforward warning that a first-time refusal to submit to chemical testing must be followed by a minimum term of confinement upon conviction for operating a motor vehicle while under the influence of alcohol or drugs. The State would advance its prospects for obtaining the most *reliable* evidence of intoxication—the suspect's blood-alcohol level, *see Mackey*, 443 U.S. at 19, 99 S.Ct. at 2621 (characterizing "chemical test" results as "the most reliable form of evidence of intoxication for use in subsequent proceedings.")— while the suspect in custody would receive

full, fair, and timely notice of the relevant options and their consequences.

### (iii) *Governmental Interests*

Lastly, the governmental interests at stake, and the administrative and fiscal burdens attendant to any additional procedural safeguard, must be considered. *See Mathews*, 424 U.S. at 347–48, 96 S.Ct. at 908–09. Although the police power is among the least limitable, *Lambert*, 355 U.S. at 228, 78 S.Ct. at 242–43, the State of Maine points to *no* governmental interest in omitting mention of the mandatory minimum sentence in its standard advisory. Indeed, it is difficult to posit a *legitimate* governmental interest served by implicitly misleading OUI suspects into *refusing* to be tested. Rather, the State's legitimate interest in obtaining the most reliable evidence of intoxication, through the voluntary cooperation of OUI suspects, is *better* served by advising the suspect of *all* sanctions for *refusing* testing.

The State has a paramount interest in minimizing any pre-testing delay which might render chemical-test results unreliable. *See Schmerber*, 384 U.S. at ˙770–71, 86 S.Ct. at 1835–36. In all likelihood, however, a simple, straightforward amendment to the standard advisory would expedite chemical testing; certainly, it would not delay it.[16] And the effort to eradicate the tragic consequences of drunken driving on Maine highways would be advanced thereby, rather than hindered.

The ease with which an alternative procedure can be implemented likewise weighs heavily in favor of an amendment to the standard advisory, *see Mathews*, 424 U.S. at 348, 96 S.Ct. at 909 ("At some point the benefit of an additional safeguard to the individual ... may be outweighed by the cost."), especially since it would occasion neither pre-testing delay nor significant expense.

As the mandatory minimum sentence was imposed in violation of the Due Process Clause, I agree that the writ should enter in

---

**16.** The majority opinion persuasively demonstrates that no Sixth Amendment right to counsel arose until well after Roberts refused to be tested. But though I share the view that Roberts was not accorded the process due when con-

fronted with the choice whether to submit to chemical testing, I am unable to agree with the court that he was entitled to the assistance of counsel at that time, as distinguished from *appropriate notice* of the consequences of refusing.

the event the State of Maine does not vacate the mandatory minimum sentence and afford petitioner a meaningful sentencing hearing at which section 1312–B(2)(B)(4) is not applied.