.STATE OF MAINE
CUMBERLAND, ss

UNIFORM CRIMINAL DOCKET
DOCKET NO. CR-16-2749

STATE OF MAINE

v.

ORDER ON MOTION TO SUPPRESS

JOSETTE CORMIER

Josette Cormier ("Cormier") pled not guilty to the charge of criminal operating under the influence with a blood alcohol level of .15 grams or more, Class D, in violation of 29-A M.R.S. § 2411(1-A)(A). Cormier filed a motion to suppress, raising two issues derived from the stop of her motor vehicle and the administration of a blood alcohol test by Sergeant Jeffrey Viola and Officer Nicholas Gower ("Viola" and "Gower", respectively) of the Portland Police Department. Cormier contends first that there was not probable cause to arrest at the point Viola stated that if she didn't take the field sobriety tests, he could arrest her, and second that during the administration of the intoxilizer test, Gower made erroneous statements that deprived Cormier of her due process rights.

Cormier relies of *State v. Stade*, 683 A.2d 164 (Me. 1996), and *State v. Murphy*, 2006 *Me. Super LEXIS* 38, in making her arguments. The State reponds that *State v. Bavouset*, 2001 ME 141, and *State v. Brann*, 736 A. 2d 251 (1999), are on point with the facts of this case and counter defendant's arguments.

## FINDING OF FACTS

The court makes the following findings of fact in this case: On March 31, 2016, Sgt. Viola responded to a radio call that an anonymous caller said he observed an

individual consume alcohol and leave a bowling alley. The caller reported that he was following her vehicle and gave the direction of the vehicle and the license plate number of that vehicle. Sgt. Viola located the vehicle, and observed the vehicle swerve over the line, the two left tires completed crossing the line. Viola stopped the vehicle. He smelled intoxicants and asked the driver to remove the cough drop she had in her mouth. Viola explained to the driver that a 911 call came in about her drinking and driving. The driver admitted she had been at Spare Time, the bowling alley, and that she drank "whiskey ginger."

Viola smelled alcohol on her breath. Viola asked her to step out of the car so he could administer the field sobriety tests to which she responded, did she have to take them? Viola stated, these tests were designed to determine whether she was under the influence and they could help her. Viola further stated if she did not want to take the tests, he was willing to go on what he had for probable cause to arrest her. The driver got out of the car and took the field sobriety tests; thereafter, Viola placed her under arrest for operating a motor vehicle while under the influence, and asked Officer Gower to transport her to the Portland Police Department to administer the breath intoxilizer.

Gower tried to administer the intoxilizer at the Portland Police Department but after thirty minutes, he determined it was not working and transported Gower to the jail. The defendant submitted a video of the administration of the intoxilizer test administered at the Portland Police Department. (Def.'s Ex. 1) The defendant challenges what the officer said to her during the administration of the intoxilizer test as violative of her due process rights.

2

The video discloses that Gower read the implied consent form and had small talk with Ms. Cormier, who was very cooperative, had many questions, but appeared to be upset, wiping tears from her eyes from time to time. Gower explained that the intoxilizer measures breath alcohol. Ms. Cormier was worried and afraid of losing her license. She asked should she have a lawyer, did she need one. Gower told her he would explain to her the consequences. It is worth repeating their conversation verbatim:[1]

> 11:40:22
> Defendant: What if I refuse to take the Breathalyzer? What happens?
> Officer: I can explain to you the consequences, but I can't give you counsel on what you should or shouldn't do. I'll tell you in one second. I've just got to punch some information and then I'll read you the whole refusal sheet so you know exactly what your options are, OK? I can tell you that if you do a refusal, which is if you don't blow, your license is automatically suspended for up to two years and you will go to jail if you're found guilty.

> 11:40:55
> D: And if I blow and I'm found to be over the 0.08, what?
> O: There'll be a much lesser license suspension. And the DA will probably be able to work with you.

> 11:41:53
> O: I'll read you this form. This is what we call the green form or the refusal form, OK? This is what would happen if you refuse to blow. By operating or intending to operate a motor vehicle in this state you have a duty to submit to and complete chemical tests, which this is, to determine your alcohol level and drug concentration. I will give you a breath test, unless I decide it is unreasonable, in which case another chemical test will be given. If you are requested to take a blood test—you're not being asked to do that—you may ask that a physician perform the test if a physician is reasonably available. If you fail to comply with your duty to submit to and complete a chemical test, your driver's license or permit, or right to apply for a license, will be suspended for a period of up to six years. Your failure to submit to a chemical test is admissible against you at any trial for operating while under the influence of intoxicating liquor or drugs. If you are convicted, which means found guilty of operating while under the influence of intoxicating liquor or drugs, your failure to submit to this chemical test will be considered an aggravating factor at sentencing, which in addition to other penalties, will subject you to a mandatory minimum period of incarceration. If you are 21 years of age or older, which you're not, in addition, excuse me . . .

---

[1] The court found the tape recording to be difficult to hear in many places.

D: Yeah, I am.

11:43:00
O: Excuse me, there's more to this though. An additional 275 days' suspension will be imposed, if you had a passenger under 21, which you did not, with you in the vehicle at the time of the offense. So, essentially if you refuse to blow, and then later on you're found guilty—-just because you refuse to blow doesn't mean you're going to be found guilty—but if you are at that point, there's a mandatory minimum period of incarceration, which means you will go to jail.

D: OK, say that again.

11:43:25
O: If you refuse to blow, and you're found guilty of an OUI, there's a mandatory minimum period of incarceration, which means that you will spend time in jail. Whereas if you blow and you're found guilty they might just give you a fine and suspend your license for a little bit. Does that make sense? And if you refuse to blow, your license will be suspended automatically up to a period of six years.

D: OK, say that last part again.

11:43:50
O: If you refuse to blow into this instrument, your license will be suspended automatically, and it could be suspended for up to six years.

D: That's a little bit of manipulation, don't you think?

O: Well, that's why they do it. It's called implied consent. When you get your driver's license, you agree that you will do roadside tests and this instrument. So that's why there's a harsh penalty because driving's a privilege, not a right. Does that make sense?

D: Yup.

11:44:20
O: I can't give you counsel as to what you should or shouldn't do, but for your first time offense, I wouldn't take a six-year license suspension. That's crazy. Especially with you, do you have any criminal history at all?

D: Shakes head no.

11:54:09
O: Do you think you have a good understanding of how to use the mouthpiece? Because a lot of people pretend that they're blowing into it and they're not. It's a

4

huge pet peeve of mine. So just let me know now, are you going to blow into it and do the test?

D: The whole thing, right?

O: Yeah. Just pretend like you're blowing up a balloon. Just blow as long as you can, OK?

D: So they're trying to do that to avoid?

O: Yeah, but what I do is I give them a refusal afterward if you can't just, which is what we talked about you don't want to do. It's your choice. I read you the consequences, right?

D: Yeah.

In summary, the officer first told her if she refuses, she would automatically lose her license for up to two years and would go to jail if found guilty. The officer corrected this misstatement when he reads to her the refusal form. When the officer read the refusal form, he advised her that if she refuses her license would be suspended for a period of up to six years and she would be subjected to a mandatory minimum period of incarceration, whereas if she blows and she is found guilty, "they might just give you a fine and suspend your license for a little bit." When Ms. Cormier asked if I blow and it is over a .08, then what, the officer replied, a much lesser license suspension and the DA will probably work with her. In the end, the Portland Police Department intoxilizer was not working and the officer transported her to Cumberland County where Ms. Cormier submitted to the administration of the intoxilizer test.

Defendant argues that the officer did not have probable cause at the time he told Ms. Cormier he would arrest her if she didn't submit to the field sobriety tests. Defendant also argues a due process violation in the mistaken statements that Gower

5

made to Ms. Cormier while she was in the process of making a decision about whether to take the intoxilizer and that his misstatements affected her decision making.

## DISCUSSION

1.    Probable Cause to Arrest

The defendant's argument that the officer lacked probable cause to arrest her fails because "[t]he probable cause standard for requiring a person to take a blood-alcohol test has a very low threshold." *State v. Forsyth*, 2002 ME 75, ¶ 14, 795 A. 2d 66, 70 (citations omitted) "For there to be probable cause for OUI, an officer only needs evidence sufficient to support the reasonable belief 'that the person's senses are affected to the slightest degree, or to any extent, by alcohol that the person has had to drink.'" *Id.* (citing *State v. Webster*, 2000 ME 115, ¶ 7, 754 A. 2d 976, 978). Probable cause has been found on as little evidence as an improper U-turn, smell of strong odor of alcohol on the defendant's breath and hearing the defendant make an incredible statement believed to be made to cover-up the defendant's impairment. *See State v. Webster*, 2000 ME 115, ¶ 7.

In this case, the officer had a credible report of the person making the tip that she was seen drinking at the bowling alley and then driving a motor vehicle. The caller identified her vehicle by the license plate number and followed her as the caller made the report. The officer observed the identified vehicle and saw her swerve with the two left tires completely over the line. Once the officer stopper her, he smelled intoxicants, observed the driver with a cough drop in her mouth which he asked her to remove because that is a common way to try to cover the smell of intoxicants. The officer then explained to the driver about the individual who had reported her drinking and then

6

driving. Ms. Cormier admitted she had been at Spare Time, a bowling alley, and had drunk "whiskey ginger". The officer smelled alcohol on her breath. All of these observations were not only sufficient to ask her to submit to field sobriety tests, but together with a refusal to take the tests would have given the officer the requisite probable cause to arrest her for OUI. Cf. *State v. White*, 2013 ME 66, ¶ 15.

In this case, the facts establish the reasonable belief of a prudent and cautious officer that Ms. Cormier had been operating her vehicle while under the influence, and more than justified the officer's determination to arrest the defendant.

2.     Due Process Rights

The next issue is whether the officer made erroneous statements in the administration of the intoxilizer test and whether those statements deprived the defendant of her due process rights. The officer's first erroneous statement was that her license would be suspended for two years if she refused the test. However, that statement was corrected when the officer read the refusal form stating that if she refused the test, her license would be suspended for a period up to six years.

The only other statement that could be construe as erroneous is the officer's answer to the question, "and if I blow and I'm found to be over the 0.08, what?" The first part of the answer that there would be a much lesser suspension is not erroneous. The second part of the answer that "the DA will probably be able to work with you", while not erroneous, it is vague and not complete. The officer did not tell the defendant the consequences if she blew a 0.15 or more would include a minimum mandatory jail term.

It is well settled that "the loss of a driver's license is a property interest worthy of due process protection." *State v. Stade*, 683 A. 2d 164, 166 (Me. 1996).

7

> The Due Process Clause of the Constitution prohibits deprivations of life, liberty, or property without "fundamental fairness" through governmental conduct that offends the community's sense of justice, decency and fair play . . . The test for determining whether state action violates the Due Process Clause . . . requires a court to consider: (1) the private interest that will be affected by the government's action; (2) the risk of an erroneous deprivation of such interest through the existing procedure and the probable utility of additional or substitute procedural safeguards; and (3) the government's interest in adhering to the existing procedure, including fiscal and administrative burdens that additional procedures might entail.

*Roberts v. Maine*, 48 F. 3d 1287, 1291-1292 (1st Cir. 1995). This concern for due process is no less so with regard to a loss of a liberty interest. Here Ms. Cormier would be incarcerated if she took the test and the result was a .15 blood alcohol level or more.

The cases cited by defendant do not assist her. In *Roberts*, the officer failed to inform defendant of a minimum mandatory sentence for failure to take the test. *Roberts*, 48 F. 3d at 1292. In *Stade*, the officer incorrectly assured defendant not to worry about losing his license because he could obtain a license for work purposes. *Stade*, 683 A. 2d at 165. Based on that false information, and the officer's failure to read the implied consent form, the suppression of the blood alcohol test was affirmed on due process grounds. *Id.* at 166. In *Murphy*, 2006 *Me. Super LEXIS* 38, the officer told the defendant that if she did not submit to a blood alcohol test, she would go to jail overnight and that if she submitted to a test, she could go home. The court ruled that the officer's action affected the defendant's ability to choose and impermissibly added the immediate consequence of incarceration for refusal. The court concluded this was fundamentally unfair and offensive to the community's sense of fair play

On the other hand, the State's reliance on *Bavouset*, does not help the State. In *Bavouset*, the officer incorrectly told defendant that the mandatory period of incarceration for a refusal was 48 hours as opposed to the required 96 hours. *State v. Bavouset*, 2001

ME 141, ¶ 2, 784 A.2d 27. In distinguishing *Stade*, the court found no violation of due process because the officer informed defendant about a minimum mandatory sentence for a refusal but misstated the duration of the incarceration. *Id.* at ¶15.

In this case, the officer by his omission misled the defendant in the consequences if she took the test. A defendant does not have "a constitutional right to be informed of every possible consequence of refusing to submit to a blood-alcohol test as long as he or she is warned that significant negative consequences will result." *State v. Cote*, 1999 ME 123, ¶¶ 10, 17, 736 A. 2d 262. There is, however, a "strong due process justification for requiring law enforcement officials . . . to refrain from giving drivers assurances that minimize the seriousness of a subsequent loss of license privileges." *Stade*, 683 A. 2d at 166. This is even truer for loss of a liberty interest. The State has no legitimate interest in allowing law enforcement officers "to affirmatively mislead citizens about the consequences of taking or failing to take a blood-alcohol test." *Id.* (emphasis supplied). Thus, this court must review the procedures used by the police to determine if the conduct in this case "offends the community's sense of justice, decency and fair play." *Cote*, at ¶ 11, 736 A. 2d 262 (quoting *Roberts*, 48 F.3rd at 1291.)

In this case, the officer did not make the mistakes that the officers made in *Roberts, Stade, State v. Murphy*, 2006 Me. Super LEXIS 38, and *State v. Brann*, 1999 ME 113, 736 A. 2d 251. The officer read the implied consent form and he advised her that there was a minimum mandatory sentence for failing to take the test. The officer did not give her inaccurate or misleading information about failing to take the test. The officer, however, also told her about the consequences of taking the test. He told her that if she took the test she might just receive a fine and a suspension of her license for a little bit.

9

This information was misleading because the officer did not correctly explain to her the consequences of taking the test, particularly if the test result was .15 or greater, that is there would be a minimum mandatory jail term. The law does not require an officer to inform a defendant about the consequences of taking the test. Yet, the Law Court in its discussion of due process law voices concern about the consequences of taking or failing to take a blood-alcohol test, *Stade*, 683 A. 2d at 166, and the consequences of submitting to or refusing the test, *State v. Brann*, 1999 ME 114, ¶ 10, 736 A. 2d 251. Here the officer complied with the implied consent law but made affirmative representations to the defendant about the consequences if she took the test. The officer minimized the consequences in taking the test and omitted that taking the test could result in a minimum mandatory jail sentence. This affected the defendant's decision to take the test.

This is conduct that offends the community's sense of justice, decency and fair play. Here there is a private liberty interest. The officer's providing the defendant with inaccurate information was fundamentally unfair to the defendant. There is also a strong due process justification for requiring law enforcement officials to inform drivers of not only implied consent information but with accurate information about consent when giving information about consenting to the test. The officer should not be permitted to give drivers assurances that minimize the seriousness of a loss of liberty interests. Although the state's interest in preventing drunk drivers from operating on our highways is great, the State has no legitimate interest in allowing its law enforcement officers to affirmatively mislead citizens about the consequences of taking or failing to take a blood-alcohol test. The admission of the blood-alcohol test in the circumstances of this case would be fundamentally unfair and accordingly the test is suppressed.

10

The entry is:

Motion to Suppress is Granted on the basis of violation of due process rights.

Date: December 5, 2016

Joyce A. Wheeler, ARJ
Maine Superior Court