# IN THE SUPREME COURT OF IOWA

No. 20–0445

Submitted February 17, 2021—Filed June 4, 2021

**STATE OF IOWA,**

    Appellee,

vs.

**MATTHEW ROBERT SEWELL,**

    Appellant.

---

Appeal from the Iowa District Court for Dickinson County, David C. Larson, District Associate Judge.

A defendant appeals the denial of his motion to suppress, claiming that he had a right to a confidential telephone call with an attorney before deciding whether to take a blood alcohol test. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, McDonald, Oxley, and McDermott, JJ., joined. Appel, J., filed an opinion concurring in part and dissenting in part.

Robert G. Rehkemper (argued) of Gourley, Rehkemper & Lindholm, P.L.C., West Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven (argued), Assistant Attorney General, and Amy E. Zenor, County Attorney, for appellee.

**MANSFIELD, Justice.**

We are asked to decide today whether Iowa law or the Iowa Constitution guarantee a suspected drunk driver the right to a private phone consultation with counsel before deciding whether to take a blood alcohol test. We conclude that Iowa law does not provide such a right because the statute provides that if a call to counsel is made, "it shall be made in the presence of the person having custody of the one arrested or restrained." Iowa Code § 804.20 (2019). We conclude that the Iowa Constitution does not provide such a right because the right to counsel under article I, section 10 arises in "criminal prosecutions" and "cases involving the life, or liberty of an individual," not in procedures that occur before such a prosecution or case is commenced. For these reasons, we hold that the defendant was not entitled to a private phone consultation with counsel and his motion to suppress was properly denied. We affirm the defendant's conviction and sentence.

## I. Background Facts and Proceedings.

On January 15, 2019, at 2:49 a.m., dispatch received a call from a local resident reporting that someone was passed out in a truck in their driveway in Milford. Dickinson County Sheriff's Deputy Matt Grimmus arrived at the resident's home at about 3:00 a.m. Upon arriving, Deputy Grimmus discovered a silver Ford-150 in the driveway running with its lights on. There was a male in the driver's seat sleeping. Deputy Grimmus reported, "I knocked on the window several times to get the male[']s attention. He looked at me once and then closed his eyes. I knocked again on the window and the male looked at me and flipped me off."

The man originally denied he had identification, but eventually produced his driver's license identifying him as Matthew Sewell. Sewell admitted he had been drinking, and Deputy Grimmus noticed a strong

odor of an alcoholic beverage. Sewell did not know what street he was on and looked confused. His eyes were watery and bloodshot and his speech was slurred. Sewell did not perform well on three field sobriety tests and declined the preliminary breath test.

Deputy Grimmus arrested Sewell at 3:22 a.m. and transported him to the Dickinson County Jail. Deputy Grimmus and Sewell arrived at the Dickinson County Jail at 3:46 a.m. Deputy Grimmus read Sewell the text of the implied-consent advisory and requested a chemical breath test sample at 3:53 a.m. Following the invocation of implied consent, Deputy Grimmus gave Sewell the opportunity to contact an attorney or a family member. Sewell was allowed to use his cellphone to retrieve phone numbers but not to place calls.

Sewell left a message with Matthew Lindholm, a criminal defense attorney in West Des Moines. When Lindholm called back at 4:25 a.m., Sewell explained they were talking on the jail's landline, not Sewell's cellphone. Deputy Grimmus denied Lindholm and Sewell's request for a confidential phone call on Sewell's cellphone, stating that Sewell and his attorney could have a confidential meeting at the jail. Deputy Grimmus also indicated that the jail policy is for all detainee calls to be on the jail landline, which is recorded.

When Lindholm learned that he could not have a private phone conversation with Sewell, he declined to proceed further.[1] Lindholm later testified at the suppression hearing that he was "not comfortable advising him" under the circumstances.

At 4:55 a.m., Sewell decided to take the breath test and recorded a .206 blood alcohol content. He was booked into jail.

---

[1]At the time of the call, Lindholm was in Boone, approximately a two-and-a-half hour drive from Spirit Lake.

On February 4, Sewell was charged by trial information with operating while intoxicated (OWI), first offense, in violation of Iowa Code section 321J.2. Sewell filed a motion to suppress evidence, urging that his rights under Iowa Code section 804.20, the Fourth and Sixth Amendments to the United States Constitution, and article I, sections 8 and 10 of the Iowa Constitution had been violated. He also filed a motion to dismiss alleging due process violations. Both motions centered on the Dickinson County jail's refusal to allow Sewell a private, unrecorded conversation with Lindholm.

The district court held a hearing on the motions on August 15. Lindholm was one of the witnesses. Lindholm testified that the vast majority of his criminal practice involves OWIs. In a typical year, he handles in excess of one hundred such cases. Often, Lindholm receives calls from people who have been arrested and are in custody and are looking for advice regarding whether to consent or refuse chemical testing. In those situations, Lindholm wants to gather information, including: How much did the person drink and when? How did the person perform on the field sobriety tests and the preliminary breath test? Does the person have prior offenses? Was there an injury or death?

On November 15, the district court entered a ruling denying both of Sewell's motions. Afterward, Sewell waived his rights to a jury trial and stipulated to a trial on the minutes of testimony. The trial court found Sewell guilty of OWI on two alternative theories: being under the influence of alcohol and having a blood alcohol concentration of .08 or more. Sewell was sentenced to serve in the weekend offender program and to pay a fine of $1250 plus surcharges. *See* Iowa Code § 321J.2(3)(*a*), (*c*). Sewell appealed, and we retained the appeal.

## II. Standard of Review.

The district court's interpretation of Iowa Code section 804.20 is reviewed for errors at law. *State v. Hellstern*, 856 N.W.2d 355, 360 (Iowa 2014). "We affirm the district court's suppression ruling when the court correctly applied the law and substantial evidence supports the court's fact-finding." *State v. Walker*, 804 N.W.2d 284, 289 (Iowa 2011). We review constitutional claims de novo. *State v. Pettijohn*, 899 N.W.2d 1, 12 (Iowa 2017).

## III. Analysis.

### A. Does Iowa Code Section 804.20 Provide the Detainee a Right to a Confidential Telephone Consultation?

Iowa Code section 804.20 provides,

> Any peace officer or other person having custody of any person arrested or restrained of the person's liberty for any reason whatever, shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of the person's family or an attorney of the person's choice, or both. Such person shall be permitted to make a reasonable number of telephone calls as may be required to secure an attorney. *If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained.* If such person is intoxicated, or a person under eighteen years of age, the call may be made by the person having custody. An attorney shall be permitted to see and consult confidentially with such person alone and in private at the jail or other place of custody without unreasonable delay. A violation of this section shall constitute a simple misdemeanor.

(Emphasis added.)

Sewell argues that "made in the presence of the person having custody of the one arrested or restrained" means only that the call shall be *dialed* in the presence of the officer. After that, the officer is required to leave and allow the detainee to have a private, confidential conversation. The State argues that "made in the presence" means that the officer can

be present and listen while the detainee talks to any family member or attorney.

"We begin our inquiry in this case with the language of the statute as a whole." *Doe v. State*, 943 N.W.2d 608, 610 (Iowa 2020). Normally, when the same term is used repeatedly in the same statute, we give the term the same meaning each time. *See State v. Paye*, 865 N.W.2d 1, 7 (Iowa 2015) ("When the same term appears multiple times in the same statute, it should have the same meaning each time.").

Iowa Code section 804.20 uses the word "make" or "made" in reference to phone calls in three separate sentences. If we are to read "make" or "made" consistently in each of these sentences, the notion appears to be that the phone calls are brief and for the purpose of obtaining counsel, not for the purpose of obtaining *advice* from counsel. Thus, the second sentence of the statute says that the detainee shall be permitted to "make a reasonable number of telephone calls as may be required to secure an attorney." The third sentence says that if a call is made, "it shall be made in the presence of the person having custody of the one arrested or restrained." And the fourth sentence says that if the person is intoxicated or a minor, the call "may be made by the person having custody." To achieve consistency in the meaning of "make" in all three sentences, "make" must mean something more than "dial" and something less than "have a substantive discussion to obtain legal advice."

This reading also accounts for the contrasting terminology of the fifth sentence. That sentence expressly permits the attorney "to see and consult confidentially with" the detainee "alone and in private" at the place of detention. If phone calls came with the same guarantee of confidentiality as in-person visits, it is odd that no such language—i.e., "confidentially . . . alone and in private"—appears in the prior sentences.

Presumably, the fifth sentence's use of "confidentially . . . alone and in private" is intended to assure that in-person consultations would be privileged. *See* Iowa Code § 4.4(2) (setting forth a presumption that "[t]he entire statute is intended to be effective").

So, on a once-through, Sewell's proposed interpretation of Iowa Code section 804.20 does not seem quite right. Furthermore, we have rejected that interpretation of the statute on three prior occasions. In *State v. Craney*, the defendant was charged with and found guilty of first-degree murder of a newborn baby. *See* 347 N.W.2d 668, 671 (Iowa 1984). On appeal, the defendant argued that the trial court erred in admitting testimony that, while speaking on the phone with his attorney during the booking process, the defendant said, "I killed my baby." *Id.* at 678. We ruled that the trial court did not err in admitting the evidence. *Id.* at 679. We stated,

> [T]he telephone calls which section 804.20 assures to persons in custody are not intended to be confidential as is shown by the provision that they are to be made in the presence of the custodian. They are for the purpose of enabling the person to arrange for a legal consultation and assistance.

*Id.* at 679.

More recently, in *State v. Walker*, we specifically addressed the different treatment afforded attorney phone calls and in-person attorney visits under Iowa Code section 804.20. 804 N.W.2d at 291. There, the arrested defendant had made a total of eight calls, resulting in an attorney meeting him at the jail. *Id.* at 286–87. The in-person consultation took place in "a small detention area with three empty booths with glass partitions to separate visitors from detainees and intercoms with telephone style handsets for communication." *Id.* at 287. The area was subject to

video but not audio recording; the attorney's requests for a different room were refused. *Id.*

We gave the following overview of the rights afforded by Iowa Code section 804.20:

> The statute expressly provides for greater privacy when the attorney personally visits his client at the police station or other place of custody. Indeed, "the telephone calls which section 804.20 assures to persons in custody are not intended to be confidential as is shown by the provision that they are to be made in the presence of the custodian." *State v. Craney,* 347 N.W.2d 668, 678–79 (Iowa 1984) (allowing into evidence defendant's statement, "I killed my baby" made in phone call to attorney overheard by police officer during booking process because statement made in the presence of a third person is not protected by attorney–client privilege). For that reason, attorneys who consult by telephone with persons arrested for OWI typically tell their client to answer only "yes" or "no" to the attorney's questions. By contrast, section 804.20 clearly allows for privileged communications at the place of detention where the attorney shall be permitted to "consult confidentially" with his client "alone and in private."

*Id.* at 291. Ultimately, given the video monitoring of the attorney meeting, we determined that the defendant's right under section 804.20 to "see and consult confidentially" and "alone and in private" with his attorney had been violated. *Id.* at 296.

In *State v. Hellstern*, we again discussed Iowa Code section 804.20's parameters for attorney phone calls. 856 N.W.2d at 357. In *Hellstern*, a defendant had been arrested for OWI. *Id.* at 358. After arriving at the jail, the defendant was asked if he wanted to make "any phone calls for any reason." *Id.* Following a series of phone calls, voicemails, and text messages, the defendant finally spoke with an attorney. *Id.* at 358–59. During that phone call, the defendant asked the officer, who was sitting five feet away, "Can I have a moment with my attorney?" *Id.* at 359. Later in the same phone call, the defendant expressly requested "attorney–client privilege." *Id.* The officer responded, "You can, but . . . [n]ot on the phone."

*Id.* (omission in original). The officer failed to specifically inform the defendant that he could have a confidential and privileged conversation with his attorney if the attorney came to the jail. *Id.* Following the denial of a motion to suppress, the defendant was found guilty of OWI. *Id.* at 360.

On appeal, the defendant argued that his request for privacy during the phone call triggered an obligation on the part of the officer to disclose the defendant's right to a private attorney–client conference at the jail. *Id.* We began our analysis by once again distinguishing a section 804.20 phone call and a section 804.20 in-person attorney consultation:

> Section 804.20 requires police to allow the arrestee "to make a reasonable number of telephone calls as may be required to secure an attorney." Iowa Code § 804.20. The statute, by its terms, affords no privacy to a person in custody during a phone call to their attorney. *See id.* ("If a call is made, it shall be made in the presence of the person having custody of the one arrested or restrained.").

*Id.* at 361. "By contrast," we observed, "the statute expressly provides a right to a confidential consultation between an attorney and client at the jail to be conducted 'alone and in private.' " *Id.* (quoting Iowa Code § 804.20); *see also id.* at 364 ("[S]ection 804.20 permits phone calls 'in the presence' of the officer, while providing for confidential *in-person* attorney–client conferences at the jail or place of detention." (quoting Iowa Code § 804.20)).

We then ruled that the defendant's motion to suppress should have been granted. *Id.* at 365. We found that the defendant

> adequately invoked his statutory right to a confidential consultation with his attorney under section 804.20 by requesting privacy during his phone call, triggering [the officer's] duty to inform him that the attorney must come to the jail for a confidential conference.

*Id.* at 364–65.

*Craney*, *Walker*, and *Hellstern* all indicate that there is no section 804.20 right to a private phone call. *Craney*, 347 N.W.2d at 679; *Walker*, 804 N.W.2d at 291; *Hellstern*, 856 N.W.2d at 361. Hence, thirty-seven years' worth of stare decisis cut against Sewell's interpretation of section 804.20. *See Hellstern*, 856 N.W.2d at 363 (discussing the importance of legislative acquiescence in regard to the statute).

Also, there are practical reasons why the legislature might be concerned about private phone calls but not private attorney jail visits. *See* Iowa Code §§ 4.4 (3) (setting forth the presumption that "[a] just and reasonable result is intended"), .6(5) (stating that if a statute is ambiguous, the court may consider "[t]he consequences of a particular construction"). As the plurality noted in *State v. Senn*, "Iowa Code section 804.20 applies to all detainees, not just motorists suspected of impaired driving. It is easy to imagine detainees taking advantage of private phone calls to inform confederates to flee or get rid of evidence." 882 N.W.2d 1, 31 (Iowa 2016) (plurality opinion). When an attorney comes to the jail for a private consultation, law enforcement can verify the attorney's identity and rely on the attorney's ethical obligation that no shenanigans will occur. But when a just-arrested detainee is given the right to conduct phone calls in private, there is no practical way to prevent misuse of the phone.[2]

---

[2]A few comments on the opinion concurring in part and dissenting in part are warranted here. That opinion states there was no real risk that Sewell would have contacted confederates. But that isn't the issue. The statute applies to *all* arrested defendants.

The opinion concurring in part and dissenting in part claims that "more than ten states [actually eleven, if you read on in that opinion] permit private conversations in the context of implied consent." We have some doubts about these numbers. *See State v. Griffith*, 660 N.E.2d 710, 711 (Ohio 1996) (holding that exclusion of the breathalyzer evidence should not occur even if the police violate the statutory right to counsel); *State v. Federov*, 355 P.3d 1088, 1093 (Wash. 2015) (en banc) (finding that whether the defendant had a rule-based right to a private conversation involved a "case-by-case determination"). But the other side of this coin is that the vast majority of states do not

For all these reasons, we conclude that Deputy Grimmus did not violate Sewell's rights under Iowa Code section 804.20 when he denied him a private and confidential phone call with attorney Lindholm. By way of caution, we emphasize what is not before us. Sewell is *not* arguing that he had a statutory right to have only his end of the conversation monitored. We noted in *Walker* that this is the usual practice. *See* 804 N.W.2d at 291 ("[A]ttorneys who consult by telephone with persons arrested for OWI typically tell their client to answer only "yes" or "no" to the attorney's questions."). However, in Dickinson County, law enforcement apparently monitors both ends of the call. Whether section 804.20 permits that level of monitoring is not before us today.[3]

**B. Does the Iowa Constitution Provide the Detainee a Right to a Confidential Telephone Conversation?**

1. *Article I, section 10.* Alternatively, Sewell argues that an arrested person has a right under article I, section 10 of the Iowa Constitution to consult privately with counsel before deciding whether to consent or refuse chemical testing. Article I, section 10 provides,

> In all criminal prosecutions, and in cases involving the life, or liberty of an individual the accused shall have a right to a speedy and public trial by an impartial jury; to be informed of the accusation against him, to have a copy of the same when demanded; to be confronted with the witnesses against him; to have compulsory process for his witnesses; and, to have the assistance of counsel.

---

recognize such a right, either by statute or under their state constitutions. *See Senn*, 882 N.W.2d at 22–27.

[3]Sewell also argues that the COVID-19 pandemic presents a reason for interpreting Iowa Code section 804.20 to allow confidential attorney–client phone calls. Sewell argues that during the pandemic, many law enforcement agencies and jails have been closed to the public, thus precluding in-person visits. However, this case predates the pandemic, and there is no dispute that the Dickinson County jail would have permitted an in-person confidential attorney consultation in January 2019. The COVID-19-related issues referenced by Sewell are not before us today.

Iowa Const. art. I, § 10.

We considered this issue in *State v. Senn,* but there was no majority opinion in the case. A plurality of the court concluded the detainee had no right to counsel under article I, section 10. *See* 882 N.W.2d at 31. Three justices dissented on the basis there was such a right, *see id.* at 32–33 (Wiggins, J., dissenting), *id.* at 68 (Appel, J., dissenting); and one justice specially concurred on the ground that if even if there was such a right, it was not violated in the particular case. *Id.* at 32 (Cady, C.J., concurring specially).

*Senn*'s facts are similar to the facts here. An individual who had been arrested for OWI and received the implied consent advisory telephoned an attorney. *Id.* at 4 (plurality opinion). While on the phone with the attorney in the officer's presence, the individual was instructed by the attorney to ask the officer for "attorney–client privilege please." *Id.* The officer responded that this individual could not have attorney–client privilege while on the phone but would be afforded the privilege if the attorney came to the jail. *Id.* The attorney was unable to meet in person. *Id.* at 5. The individual later consented to taking the test, and the results showed his blood alcohol concentration was 0.140. *Id.*

After he was charged with OWI, the defendant filed a motion to suppress. *Id.* At the suppression hearing, he narrowed his claim to one for deprivation of the right of counsel under the Iowa Constitution. *Id.* The district court denied the motion. *Id.* at 5–6.

On appeal, the issue was whether

the right to counsel under article I, section 10 of the Iowa Constitution attached before the State filed criminal charges against [the defendant] while he was under arrest for the suspicion of drunk driving and faced with the decision of whether to submit to a chemical breath test that measures his blood alcohol level.

*Id.* at 6.

The *Senn* plurality concluded that the right to counsel did not attach at that stage. The plurality "beg[a]n with the plain meaning of the words of article I, section 10." *Id.* at 8. Specifically:

> [Article I, section 10] by its terms applies to "criminal prosecutions" and in "cases involving the life, or liberty of an individual." Section 10 expressly provides "the accused" with eight enumerated rights: (1) a speedy trial, (2) a public trial, (3) a trial by an impartial jury, (4) to be informed of the accusation, (5) to obtain a copy of the accusation, (6) to confront witnesses, (7) to have compulsory process for the accused's witnesses, and (8) to have the assistance of counsel. The first seven of these enumerated rights make sense only in the context of a formal legal proceeding leading to a trial. The final enumerated right—to counsel—should be construed together with the seven preceding rights in section 10 that ensure a fair trial in criminal proceedings and cases involving the liberty of the accused. We read words not in isolation, but rather in context . . . .

*Id.* at 8–9. In other words, the plurality pointed out that the other rights listed in article I, section 10 come into play only in actual court proceedings, which means that the phrases "criminal prosecutions" and "cases involving the life, or liberty of an individual" must refer to actual court proceedings. *Id.* at 8.

The plurality went on. It noted that the text of article I, section 10 provides rights only to an "accused," and then only within a "prosecution" or a "case." *Id.* at 9. The plurality also cited early caselaw reinforcing this perspective. *Id.*

Turning to the facts of *Senn,* the plurality observed that when the defendant asked for an attorney–client privileged conversation, "[t]here was not yet a prosecution or case against [him]." *Id.* at 11. The plurality reasoned, "The State had not filed criminal charges against Senn at the time he was deciding whether to submit to the chemical breath test.

Therefore, he was not entitled to counsel under article I, section 10." *Id.* at 12.

The plurality acknowledged that one early case had applied article I, section 10 to a noncriminal proceeding—*Ex parte Grace*, 12 Iowa 208 (1861). *See Senn*, 882 N.W.2d at 12 (plurality opinion). *Grace* held that article I, section 10's right to trial by jury applied to a contempt proceeding that resulted in the debtor's arrest and imprisonment. 12 Iowa at 212. But, as the plurality noted, there was a pending *case* in *Grace*. *See Senn*, 882 N.W.2d at 12. *Grace* does not suggest that there can be a constitutional right to counsel without an actual court proceeding.

The plurality also examined the drafting history behind the "cases involving the life, or liberty of an individual" language, the added text which differentiates article I, section 10 from the Sixth Amendment. The plurality pointed to various statements in the 1857 debates confirming that the language was meant to provide jury trial rights to fugitive slaves apprehended in Iowa. *Id.* at 14–16. "The framers consistently and exclusively focused on the rights of persons who had already entered the court system." *Id.* at 15–16; *see also In re Johnson*, 257 N.W.2d 47, 54 (Iowa 1977) (McCormick, J., concurring specially) ("No one can doubt from the convention record that the disputed language was added to Art. I § 10 in an effort to nullify the Fugitive Slave Act by giving persons accused as escaped slaves the right to jury trial in Iowa.").

The *Senn* plurality also surveyed constitutional precedents from other states. 882 N.W.2d at 22–30. It noted that "[t]he vast majority of courts deciding the issue conclude there is no state constitutional right to counsel at the time the motorist must decide whether to submit to chemical testing." *Id.* at 22. It approved the reasoning of those courts:

These authorities are persuasive. We too want to avoid creating an unworkable rule for determining when the right to counsel attaches. If we expand the right to counsel to include implied-consent chemical breath tests *before* any criminal case is filed, what is the limiting principle? Why stop there? Why not expand the right further to include noncustodial questioning by police or police requests for consent searches before any charges are filed? The text of our constitution provides a clear starting point for the attachment of the right to counsel—the court filing that commences the criminal proceeding or other case putting liberty at risk. We are unwilling to erase that bright line.

*Id.* at 26.

Furthermore, the plurality found practical problems with the defendant's position in *Senn*:

[A]ny Iowa constitutionally based right to counsel should apply equally to rich and poor alike. . . . Thus, if we hold an individual is constitutionally entitled to a private consultation with legal counsel at the time the State invokes implied consent, the State would need to ensure that public defenders or court-appointed lawyers are available twenty-four hours a day to field calls from detained motorists, typically late at night.

*Id.* at 31 (citation omitted). "In addition, we would need to provide continuous court and public defender access to process applications for court-appointed counsel." *Id.*

Justice Wiggins, dissenting, took issue with the plurality's reading of the 1857 constitutional debates. In his view, "during the debates, the framers acknowledged that cases in which individuals have been arrested implicate physical liberty interests sufficient to trigger rights under the 'cases' language of article I, section 10." *Id.* at 45 (Wiggins, J., dissenting). Justice Wiggins pointed out that an opponent of adding the "cases involving the life, or liberty" language "argued its import would be to extend the reach of article I, section 10 to 'any person that may be arrested, who may be taken up in any shape or way in this state.' " *Id.* (quoting 2 *The Debates of the Constitutional Convention of the State of Iowa* 736 (W. Blair

Lord Rep., 1857) (remarks of Mr. Harris)). But as the State points out in its current briefing, this reading of the constitutional debates is incomplete. Mr. Clark, the sponsor of the amendment, immediately disagreed with Mr. Harris. *Id.* at 737 (remarks of Mr. Clark). He explained that the added language "has no reference to [the defendant's] being arrested in preparation for trial." *Id.*

Justice Appel, dissenting, also disagreed with the plurality's interpretation of the "cases" language in article I, section 10. He said, "[I]t strains credulity to suggest that the 'cases' clause is simply a redundant passage and that the federal caselaw under the 'all criminal prosecutions' clause of the Sixth Amendment is applicable." *Id.* at 67 (Appel, J., dissenting). Justice Appel added,

> [T]he "cases" clause provides ample footing for a right to counsel when implied consent is invoked. In this case, the suspect faces a critical stage that will dramatically affect the subsequent criminal trial and could well lead to revocation of his driver's license for an extended period of time.

*Id.* at 68. Yet Justice Appel's first point is an attack on a strawman; no one contends that the "cases involving the life, or liberty of an individual" language is simply redundant. The framers put it in there to assure a right to jury trial in Fugitive Slave Act cases that did not involve a criminal prosecution. And his second point does not account for the full text of article I, section 10, which provides that "*the accused*" shall have the right to counsel "*in* cases involving the life, or liberty of an individual." Iowa Const. art. I, § 10 (emphasis added.) The right is for an accused within a case, not for an individual who may or may not end up in a case later.[4]

---

[4]Justice Appel also endorsed the approach taken by a few states that have found a constitutional right to counsel in the implied-consent context. *Senn*, 882 N.W.2d at 63–65.

In today's opinion concurring in part and dissenting in part, Justice Appel again fails to account for this language—i.e., "cases" and "the accused." In addition to *Grace*,

On balance, we believe the position taken by the *Senn* plurality is more persuasive as a matter of text and history. Accordingly, we adopt it here. Moreover, in two decisions subsequent to *Senn*, we have taken the view that the article I, section 10 right to counsel does not attach prior to the initiation of a case or prosecution.

In *State v. Green,* we examined whether the article I, section 10 right to counsel extended to a murder suspect who had participated in a noncustodial police interview under the supervision of an Iowa county attorney. 896 N.W.2d 770, 773 (Iowa 2017). Multiple times during the interview, one of the officers would leave the interview room to consult next door with the attorney. *Id.* It was clear that the attorney facilitated the interview and directed the officers to ask specific questions. *Id.*

We ruled that the defendant's rights under article I, section 10 had not been violated. As we explained, "[T]he text of the constitution is at the core of our analysis and is our primary focus." *Id.* at 778. "The text tells us that the right to counsel applies only to the accused and, for the purposes of this case, only to a criminal prosecution." *Id.* We added, "It is only once a prosecution is commenced that the imbalance [between law enforcement and the suspect] is corrected through the adversary process and through the right to counsel given by article I, section 10." *Id.* at 779. In the last paragraph of our opinion, we summed up,

> There was no right to counsel provided by article I, section 10 of the Iowa Constitution at the time of [defendant's] voluntary and noncustodial interview with police under the supervision of an Iowa county attorney. The constitutional right to counsel is essential to ensuring a fair trial, but has no

---

the only Iowa precedent he cites for supporting his views is *State v. Newsom*, 414 N.W.2d 354 (Iowa 1987). But *Newsom* involved a defendant who had been arrested on murder charges, taken before a magistrate, had counsel appointed, and then interrogated without that counsel present. *Id.* at 356. In that case, the defendant was an accused in a pending case.

> application without a prosecution or case with which counsel could aid the accused.

*Id.* at 782.

A year later, in *Ruiz v. State*, we considered whether bad advice from an immigration attorney to a client, which led to a criminal investigation and conviction of the client for having previously used a false social security number, could be ineffective assistance of counsel under article I, section 10 of the Iowa Constitution. 912 N.W.2d 435, 436 (Iowa 2018). The defendant was a native and citizen of Mexico who had entered the United States without permission. *Id.* After entering the United States, the defendant had obtained vehicle titles in his name using a false social security number. *Id.* Subsequently, through the attorney's efforts, the defendant was able to get a valid social security number. *Id.* at 437. At that point, without inquiring into whether the defendant had used a fraudulent social security number in the past to title vehicles, the attorney suggested that his client go to the Iowa department of transportation (DOT) to obtain a driver's license. *Id.*

This trip led to the DOT's discovery of the defendant's prior use of a false social security number to register vehicles. *Id.* at 438. The defendant was charged with and convicted of fraudulent practices, and faced deportation. *Id.* The defendant sought postconviction relief on the ground that his immigration attorney had provided ineffective assistance of counsel. *Id.* The district court granted relief, and the State appealed. *Id.*

We ruled that the defendant did not have a right to relief for ineffective assistance of counsel because, at the time of the allegedly faulty advice, he did not have a right to counsel under either the Sixth Amendment or article I, section 10 of the Iowa Constitution. *Id.* at 439–41. Regarding the latter, we said, "The language of the provision indicates

the person claiming the right to counsel must be an 'accused' in either a criminal prosecution or a case involving that person's life or liberty." *Id.* at 441. We relied on "*Green* and the text of article I, section 10" in holding no right to counsel had attached under the Iowa Constitution. *Id.*

For these reasons, we conclude that Sewell did not have a right to counsel under article I, section 10 before deciding whether to take the chemical test on January 15, 2019.

2. *Article I, section 9.* Finally, Sewell argues that denying him a confidential telephone conversation with Lindholm violated his right to due process under article I, section 9 of the Iowa Constitution. It is not entirely clear what standard Sewell wants us to apply, but clearly the predicate to his claim is that the State "interfere[d] with the attorney–client relationship." The problem is that, as we have already discussed, neither the Iowa Code nor the Iowa Constitution afforded Sewell the right to a private consultation with counsel. Thus, the "interference" consisted of refusing something that Sewell had no entitlement to anyway. Sewell cites a number of cases, but they involve situations where law enforcement deceived the defendant. *See, e.g.*, *Moran v. Burbine*, 475 U.S. 412, 435, 106 S. Ct. 1135, 1148 (1986) (Stevens, J., dissenting) (arguing that deceptive police interference with communications between an attorney and his client violated due process); *Roberts v. State of Maine*, 48 F.3d 1287 (1st Cir. 1995) (finding a due process violation where the defendant was given misleading information about the consequences of refusing testing, which included a mandatory forty-eight-hour period of incarceration if convicted, and the defendant's request to consult with counsel was denied). Sewell does not claim to have been misled here.

**IV. Conclusion.**

For the foregoing reasons, we affirm Sewell's conviction and sentence.

**AFFIRMED.**

All justices concur except Appel, J., who concurs in part and dissents in part.

**APPEL, Justice (concurring in part and dissenting in part).**

I respectfully concur in part and dissent in part.

## I. The Statute.

On the statutory issue, the majority is overwritten but makes some fair points. It emphasizes that prior caselaw amounts to "thirty-seven years' worth of stare decisis [that] cut against Sewell's interpretation." Perhaps so, although I think legislative acquiescence is generally a fairly weak reed in light of the inertia inherent in the legislative process. But I note that in *State v. Williams*, a similar multidecade period of stare decisis was also at work in determining the meaning of the term "arrest." 895 N.W.2d 856, 859–67 (Iowa 2017).

Stare decisis, of course, is not at work unless you believe that the underlying decision was wrongly decided. *Youngblut v. Youngblut*, 945 N.W.2d 35, 45 (Iowa 2020) (McDonald, J., dissenting). While stare decisis is often cited as a justification for a belief already held and is mere window dressing, it is at work here. If I were writing on a blank slate, I would give serious consideration to driving the interpretation of Iowa Code section 804.20 to avoid the constitutional problems presented below. *See, e.g.*, *Simmons v. State Pub. Def.*, 791 N.W.2d 69, 73–74 (Iowa 2010). There is a very large body of caselaw suggesting that a statutory right to counsel in the context of informed consent necessarily means a private consultation. *See Farrell v. Mun. of Anchorage*, 682 P.2d 1128, 1130 (Alaska Ct. App. 1984); *State v. Holland*, 711 P.2d 592, 594–95 (Ariz. 1985) (en banc); *People v. Moffitt*, 19 N.Y.S.3d 713, 718–19 (N.Y. Crim. Ct. 2015); *Bickler v. N.D. State Highway Comm'n*, 423 N.W.2d 146, 148 (N.D. 1988). Further, persons arrested in urban areas where lawyers are plentiful and within short travel distance from the jail will be far more likely to get confidential

jailhouse advice than persons arrested in rural areas with more limited availability of counsel. But this is not an issue of first impression, and it is probably too late in the day to pursue this path. So, reluctantly, I concur in the majority's interpretation of the statute.

## II. Imagination.

The majority opinion suggests that the three-judge plurality in *State v. Senn*, declared that it is "easy to imagine detainees taking advantage of private phone calls to inform confederates to flee or get rid of evidence." 882 N.W.2d 1, 31 (Iowa 2016) (plurality opinion). While the declaration *may* be partly accurate, it was supported only by "imagination," not facts or empirical evidence. Both state and federal prisons routinely permit private telephone conversations between attorneys and clients. Further, more than ten states permit private phone conversations in the context of implied consent, exactly what Matthew Sewell seeks here today. The majority has not cited cases related to abuse of phone privileges in the implied-consent context.

The blanket rule advocated by the majority is thus far overbroad. In this case, Sewell was found asleep in his car. He had no known confederates. If he had a confederate, maybe he would have been driven home without mishap. There was no suspicion of any kind that criminality other than intoxicated driving was afoot. If the majority thinks Sewell was some kind of escape threat, maybe a trained assassin, or possibly the mastermind of a criminal conspiracy, it has watched too many movies.

Of course, all rights have the potential to be abused. In fact, there is always the imaginary possibility that a criminal defense lawyer will become a secret confederate of a client in some unknown criminal enterprise. Under the majority view, a theoretical risk of abuse without any basis in fact means that a right to counsel can never be recognized,

even in situations involving people like Sewell. If so, article I, section 10 of the Iowa Bill of Rights has just been effectively repealed.

I do not rule out, in all instances, that the state might make a case for limiting contact with counsel based on articulate security concerns. But the burden will be on the state to show that the restriction was justified. *See State v. Penrod*, 892 P.2d 729, 732 (Or. Ct. App. 1995). And the state did not attempt to meet the burden in this case.

### III. Implied-Consent Laws and *Rochin v. California.*

In *Rochin v. California*, the United States Supreme court considered a case where police obtained morphine capsules swallowed by a criminal defendant. 342 U.S. 165, 166, 72 S. Ct. 205, 206 (1952). The defendant was taken to the hospital, where unpleasant means were used to extract the swallowed contraband. *Id.* According to the Supreme Court:

> Illegally breaking into the privacy of the petitioner, the struggle to open his mouth and remove what was there, the forcible extraction of his stomach's contents—this course of proceeding by agents of government to obtain evidence is bound to offend even hardened sensibilities. They are methods too close to the rack and the screw to permit of constitutional differentiation.

*Id.* at 172, 72 S. Ct. at 209–10.

In response, legislatures began passing "informed consent" laws to avoid running afoul of the teaching of *Rochin*.[5] Force was no longer to be used to obtain evidence from the body of the accused; rather, the threat of the loss of driving privileges was thought to be enough to do the job. *See State v. Spencer*, 750 P.2d 147, 151 (Or. 1988) (en banc). Physical force

---

[5]As it turns out, the Supreme Court did not extend *Rochin* to situations where the government sticks needles into people to draw blood without their consent. *See Schmerber v. California*, 384 U.S. 757, 771–72, 86 S. Ct. 1826, 1836 (1966); *Breithaupt v. Abram*, 352 U.S. 432, 436–37, 77 S. Ct. 408, 411 (1957).

was replaced with the substantial penalty of long-term loss of driving privileges.

### IV. Role of Counsel in Implied-Consent Setting.

Before we dive directly into the narrow caselaw, it is important to understand why the right to counsel is important. Without having at least a general understanding of the underpinnings of the right to counsel, it would be difficult, if not impossible, to evaluate the choices facing the court in this case.

The role of counsel is central to our criminal justice system. The current criminal justice system is a far cry from that which existed at common law, with professional police forces and trained prosecutors. "Even the intelligent and educated layman has small and sometimes no skill in the science of law." *Powell v. Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 64 (1932). Given the lack of knowledge and the tremendous power held by the state, the central role of counsel is to serve "as a medium between the accused and the power of the [s]tate." *Montejo v. Louisiana*, 556 U.S. 778, 809, 129 S. Ct. 2079, 2098 (2009) (Stevens, J., dissenting).

### V. Application of Criminal Prosecutions Clause.

Turning to the merits of the constitutional issue under the criminal prosecutions clause, the majority only briefly canvassed its arguments of the three-justice plurality in *Senn*, and I will do the same.

With respect to the Criminal Prosecutions Clause, the United States Supreme Court, under the Sixth Amendment, has declared in a series of cases that the right to counsel attaches with the filing of an indictment or other similar court document. *See Rothgery v. Gillespie County*, 554 U.S. 191, 198, 128 S. Ct. 2578, 2583 (2008); *United States v. Gouveia*, 467 U.S. 180, 188, 104 S. Ct. 2292, 2297 (1984); *Kirby v. Illinois*, 406 U.S. 683, 688–89, 92 S. Ct. 1877, 1882 (1972). Collectively, these cases were an

unfortunate development. As explained in *Senn*, I would not apply such a formalistic approach but would concentrate on function; namely, determining when counsel is required to limit the coercive power of the state's law enforcement machinery and permit an individual to effectively defend at trial. 882 N.W.2d at 51–54 (Appel, J., dissenting). As noted in *Escobedo v. Illinois*, "It would exalt form over substance to make the right to counsel . . . depend on whether at the time of the interrogation, the authorities had secured a formal indictment. Petitioner had, for all practical purposes, already been charged with murder." 378 U.S. 478, 486, 84 S. Ct. 1758, 1762 (1964).

Further, Justice Brennan noted in *United States v. Wade* that the "plain wording of this [Sixth Amendment] guarantee encompasses counsel's assistance whenever necessary to assure a meaningful 'defense.'" 388 U.S. 218, 225, 87 S. Ct. 1926, 1931 (1967). Justice Brennan further emphasized in *Wade* that any pretrial confrontation of the accused must be examined to determine the impact at trial. *Id.* at 227. And, as later noted by Justice Stevens in *Gouveia*, the attachment of the right to counsel "does not turn on the formal initiation of proceedings but 'rather on the nature of the confrontation between the authorities and the citizen.'" *Senn*, 882 N.W.2d at 53 (quoting *Gouveia*, 467 U.S. at 195, 104 S. Ct. at 2301).

While *Kirby* was controversial from the beginning, it is widely accepted, even in federal courts, that in order to preserve the effectiveness of counsel at trial, the right to counsel must attach prior to the filing of court documents in some instances. Post-*Kirby* federal courts, for instance, have held that there is a right to counsel for communications involving prefiling plea bargaining, *Chrisco v. Shafran*, 507 F. Supp. 1312, 1318–21 (D. Del. 1981), and prefiling *Massiah* violations, *DeAngelo v.*

*Wainwright*, 781 F.2d 1516, 1519 (11th Cir. 1986). And, there is some suggestion in the federal caselaw that a prefiling lineup could be sufficient to trigger a right to counsel if the suspect had in fact become an accused. *United States ex rel. Hall v. Lane*, 804 F.2d 79, 81–82 (7th Cir. 1986).

I now turn to the caselaw regarding whether a right to counsel attaches after a custodial arrest and the individual is faced with informed consent. Suffice it to say that there is substantial, and in my view persuasive, authority accepted in a number of jurisdictions holding that when an individual is placed under arrest at the station house and is confronted with the choice of providing a breath test or losing one's driver's license, the power of the state has been sufficiently focused upon the individual to give rise to a right to counsel designed to protect individuals in criminal prosecutions. Cases from Oregon, Minnesota, and Washington State provide support.

For example, the Oregon Supreme Court in *State v. Spencer* declared:

> A person taken into formal custody by the police on a potentially criminal charge is confronted with the full legal power of the state, regardless of whether a formal charge has been filed. Where such custody is complete, neither the lack of a selected charge nor the possibility that the police will think better of the entire matter changes the fact that the arrested person is, at that moment, ensnared in a "criminal prosecution."

750 P.2d at 155–56.

A similar approach was taken by the Minnesota Supreme Court in *Friedman v. Commissioner of Public Safety*. 473 N.W.2d 828 (Minn. 1991) (en banc). The Minnesota Supreme Court observed that "the expansion of the right to counsel is necessary 'when new contexts appear presenting the same dangers that gave birth initially to the right itself.'" *Id.* at 833 (quoting *United States v. Ash*, 413 U.S. 300, 311, 93 S. Ct. 2568, 2574

(1973)).  Citing *Spencer*, the Minnesota Supreme Court found implied consent an example of such a context:

> Thus, while we hold that the point at which an individual is asked by law enforcement officials to undergo a blood alcohol test constitutes a critical stage in the criminal process and that article I, section 6 of the Minnesota Constitution guarantees an individual in such a situation the limited right to counsel within a reasonable time before submitting to testing.

*Id.* at 837.

The Supreme Court of Washington considered the question of right to counsel in the context of informed consent in *State v. Fitzsimmons*.  610 P.2d 893, 901 (Wash. 1980) (en banc), *vacated*, 449 U.S. 977, 101 S. Ct. 390 (1980), *aff'd on state constitutional grounds*, 620 P.2d 999, 1001 (Wash.) (en banc) (per curiam).  The Washington Supreme Court noted that a critical stage requiring right to counsel "arises when the defendant's right to a fair trial or other substantial rights may be affected."  *Id.* at 898.  The Washington Supreme Court went on to observe that

> the period immediately after arrest and charging in a driving while under the influence of intoxicating liquor case is a "critical stage" because of the unique character of the evidence to be obtained and the trial strategy decisions which must be made then, if at all.

*Id.* at 445; *see also People v. Gursey*, 239 N.E.2d 351, 352–53 (N.Y. 1968); *State v. Welch*, 376 A.2d 351, 355 (Vt. 1977).

In addition to the five states that have found a constitutional right to counsel in the context of implied consent, at least six states have provided for confidential consultation with counsel in the informed-consent setting by statute or rule.  *Kameroff v. State*, 926 P.2d 1174, 1178 (Alaska Ct. App. 1996); *McNutt v. Super. Ct.*, 648 P.2d 122, 124 (Ariz. 1982) (en banc); *Roesing v. Dir. of Rev.*, 573 S.W.3d 634, 638–39 (Mo. 2019) (en banc); *State v. Howren*, 323 S.E.2d 335, 336 (N.C. 1984); *Kuntz v. State*

*Highway Comm'r*, 405 N.W.2d 285, 289 (N.D. 1987); *City of Lakewood v. Waselenchuk*, 641 N.E.2d 767, 770 (Ohio Ct. App. 1994).

The notion that counsel is needed to counterbalance the power of the state against a layperson arrested and charged with drunk driving is illustrated in the *Lakewood v. Waselenchuk* case. After being presented with a form stating her rights, the defendant declared, "I'm scared. This sounds like I'm up under a real big serious thing and I think I should have an attorney." *Waselenchuk*, 641 N.E.2d at 768. Then the defendant was read the implied-consent advisory and declared, "God, and I have to decide this without a lawyer?" *Id.* The average citizen is not the proverbial Oxford Don when it comes to parsing the language, and, in any event, the Oxford Don would be well-advised to call a lawyer too.

The majority cites practical reasons against extending constitutional protections in this case. Practical issues are said to arise related to providing counsel to indigent persons confronting implied consent. In *State v. Smalls*, an Oregon appellate court ruled that the limited right to counsel did not require the state to provide a lawyer to indigent drunk-driving arrestees. 120 P.3d 506, 509 (Or. Ct. App. 2005). On the other hand, in the state of Washington, rules provide that a person in custody who desires counsel shall at the earliest opportunity be given access to the telephone number of the public defender. *Fitzsimmons*, 610 P.2d at 896. In any event, a number of counties have twenty-four-hour access to appointed counsel by telephone. *Id.* at 899 n.1.

Further, the caselaw emphasizes that the right to counsel is limited so that consultation with a lawyer does not delay the administration of the test and that if counsel cannot be contacted within a reasonable period of time, a decision regarding testing must be made in the absence of counsel. *Friedman*, 473 N.W.2d at 835 ("[A]n individual has the right, upon request,

to a reasonable opportunity to obtain legal advice before deciding whether to submit to chemical testing."); *see also Gursey*, 239 N.E.2d at 353 ("The privilege of consulting with counsel concerning the exercise of legal rights should not, however, extend so far as to palpably impair or nullify the statutory procedure requiring drivers to choose between taking the test or losing their licenses."); *City of Roseburg v. Dykstra*, 854 P.2d 985, 986–87 (Or. Ct. App. 1993) (en banc) (holding that an attorney's physical presence is not required during the administration of a breath test, phone consultation is sufficient); *Welch*, 376 A.2d at 355 ("[T]he privilege of consulting with counsel concerning the exercise of legal rights should not be allowed to interfere with the necessarily expedient procedures requiring operators to make their choice whether to submit to the test.").

From *Powell v. Alabama* to *Gideon v. Wainwright*, to *State v. Young*, state authorities routinely raise "the sky is falling" practical problems in efforts to defeat providing accused with the right to counsel. But, fortunately, independent courts have repeatedly held that the right to counsel is available not only at the state's convenience.

### VI. Application of the Cases Clause.

On the cases clause, the majority claims that I created a strawman by declaring that the plurality in *Senn* made the cases clause redundant and merely duplicative of the criminal prosecutions clause. The majority claims to have defeated the strawman by declaring that the cases clause was designed to provide trial rights to fugitive slaves. But the majority gives the cases clause only a sliver of historical meaning and no contemporaneous application by artificially limiting the cases clause to Fugitive Slave Act proceedings. And it further undercuts even that sliver by stating that in order to be within the scope of the cases clause, the individual must be "an accused," a concept, according to the majority,

from criminal law. In any event, the question of fugitive slaves was resolved by the Civil War. So, the majority seeks to reduce the cases clause to at most a historical oddity and a contemporaneous nullity. To that extent, but only to that extent, I stand corrected.

The majority approach to the cases clause is too narrow. First, the language itself of the cases clause is not limited to Fugitive Slave Act cases but is general in nature. If the Iowa Constitutional Convention intended to limit the concept to fugitive slaves, it could have said so. Now the majority makes much of the use of the term "accused" in the clause, but the term "accused" was not used in a narrow or technical sense and should therefore be broadly construed. For instance, in *Ex parte Grace*, we applied the cases clause in a case involving execution remedies involving property. 12 Iowa 208, 212 (1861). Plainly, the contemporaneous understanding of "accused" was not limited to those accused of crime.

And, to use John Marshall's famous words, we must not forget "that it is a *constitution* we are expounding." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 407 (1819). Or, in the words of our local John Marshall, Justice LeGrand, "[N]o forced, unnatural, narrow, or technical construction should ever [be] placed upon the language of a constitution." *Redmond v. Carter*, 247 N.W.2d 268, 275 (Iowa 1976) (en banc) (LeGrand, J., concurring specially) (quoting 16 Am. Jur. 2d *Constitutional Law* § 76, at 258 (1964)).

Justice LeGrand's words resonate. We should not be looking for narrow constructions of constitutional provisions. Indeed, in *Gansen v. Gansen*, we broadly construed a provision in the Iowa Constitution related to agricultural leases. 874 N.W.2d 617, 626 (Iowa 2016). It would be unfathomable to broadly construe such a provision, which had a distinct

origin in the semi-feudal ways of the Hudson Valley, and yet narrowly construe the cases provision of the right to counsel.

Our precedents agree with the proposition that the right-to-counsel provisions should be generously interpreted. In *State v. Newsom*, we considered a case where the state claimed a juvenile defendant had waived his right to counsel and, as a result, admissions during a police interrogation when the defendant was in custody were admissible. 414 N.W.2d 354, 356–57 (Iowa 1987). We concluded that the state's interrogation after he "was represented by counsel[] affirmatively circumvented defendant's sixth amendment rights." *Id.* at 359.

But we further concluded that, "independent of our sixth amendment analysis," the state had also violated "defendant's right to counsel under" article I, section 10 of the Iowa Constitution. *Id.* We declared that the right to counsel in the Iowa Constitution should be broadly construed "to effectuate its purpose" of "correct[ing] the imbalance between the position of an accused and the powerful forces of the State in a criminal prosecution." *Id.*

Those interested in text will find it illuminating that the Sixth Amendment right to counsel under the Federal Constitution is limited to a criminal proceeding "for his defense." U.S. Const. Amend. VI. Under the Iowa Constitution, however, there is no such limitation. In short, the right to counsel applies in any case, and not just a criminal prosecution, and, unlike the Sixth Amendment, it does not necessarily need to be "for his defense" in a criminal prosecution.

The majority enters the parade ground of this case with two cases mounted on its prosecutorial pikes: *State v. Green*, 896 N.W.2d 770, 773 (Iowa 2017), and *Ruiz v. State*, 912 N.W.2d 435, 436 (Iowa 2018). These cases involved simple investigative actions by law enforcement. They do

not involve custodial arrests of persons charged with a crime, under arrest at the jailhouse, who are faced with informed consent. These cases do not stand for the proposition that right to counsel never applies prior to indictment or the filing of court papers. Here, we have a unique situation involving custodial jailhouse arrest and the accused facing a Hobson's choice of providing a breath specimen or losing a driver's license for an extended period of time. *See Fitzsimmons*, 610 P.2d at 900. The atmosphere is one of coercion and the decision at hand heavy with important legal implications. Time is of the essence. The guiding hand of counsel is crucial in permitting the arrestee to make an informed choice that is irreversible and will largely dictate whether he is convicted of a crime or loses his driver's license. The majority does not see it, but the State held the hammer over the hapless Sewell at 4:56 a.m. in the Dickinson County jail when he was confronted with informed consent. He has only himself to blame for his predicament, but he was entitled to legal advice to help him deal with it. The decisions made that night were irreversible regardless of the skill of trial counsel. Counsel at trial will do him little good. The main event affecting his prospects at trial occurred at the jailhouse.

### VII. Due Process.

The major state due process case in the area of implied consent is *Sites v. State*. 481 A.2d 192 (Md. 1984). In *Sites*, Sites was arrested for drunk driving in the early morning hours and taken to the police station. *Id.* at 194–95. Sites asked to call his lawyer several times, which the police refused to allow. *Id.* at 195. A breathalyzer was administered, and he tested at 0.17%. *Id.* Sites was convicted of driving while intoxicated and appealed his conviction. *Id.*

The Court of Appeals of Maryland, the highest state appellate court, concluded that Sites did not have a statutory or constitutional right to counsel. *Id.* at 195–97. The Maryland court then proceeded to consider a due process claim that Sites was entitled to counsel prior to administration of the breath test in the case. *Id.* at 197.

The Maryland court noted that the Due Process Clause had long been held to ensure the fairness of proceedings. *Id.* at 199. The Maryland court recognized that a number of courts had rejected the notion of a due process right to counsel before submitting to chemical testing. *Id.* (citing *Gottschalk v. Sueppel*, 258 Iowa 1173, 1180–82, 140 N.W.2d 866, 870–71 (1966); *State v. Jones*, 457 A.2d 1116, 1119 n.6 (Me. 1983); *State v. Braunesreither*, 276 N.W.2d 139, 140 (S.D. 1979) (per curiam)). But the Maryland court focused on the fact that continued possession of a driver's license "may become essential to earning a livelihood; as such, it is an entitlement which cannot be taken without the due process mandated by the Fourteenth Amendment." *Id.* at 200. According to the Maryland court:

> [T]he due process clause of the Fourteenth Amendment, as well as Article 24 of the Maryland Declaration of Rights, requires that a person under detention for drunk driving must, on request, be permitted a reasonable opportunity to communicate with counsel before submitting to a chemical sobriety test, as long as such attempted communication will not substantially interfere with the timely and efficacious administration of the testing process.

*Id.* The Maryland court, however, determined that Sites failed to show exactly when he asked for counsel and therefore it could not be determined whether the failure of the police to honor his request was reasonable. *Id.*; *see also Heles v. South Dakota*, 530 F. Supp. 646, 653 (D.S.D. 1982), *judgment vacated*, 682 F.2d 201 (8th Cir. 1982).

An Ohio appellate court also found a due process violation in the implied-consent context in *Waselenchuk*. 641 N.E.2d 767. In

*Waselenchuk*, the Ohio appellate court found that law enforcement failed to honor a request for counsel after the defendant was arrested for drunk driving. *Id.* at 768. According to the Ohio appellate court, "[T]he due process clause applies to the deprivation of a driver's license by the state." *Id.* (quoting *Dixon v. Love*, 431 U.S. 105, 112, 97 S. Ct. 1723, 1727 (1977)). Quoting an unreported case, the Ohio court declared that

> due process and fundamental fairness require that a person held on suspicion of drunk driving who requests the opportunity to communicate with counsel before submitting to, or refusing, a chemical test must be permitted to do so, as long as such communication does not interfere with the timely administering of the test.

*Id.* at 770 (quoting *State v. Larson*, No. 16–CA–88, 1988 WL 138429, at *1 (Ohio Ct. App. Dec. 12, 1988)).

There is Iowa authority to the contrary. In *Gottschalk v. Sueppel*, we considered whether the due process clause triggered a right to assistance of counsel in the context of implied consent. 258 Iowa at 1180–82, 140 N.W.2d at 870–71. We noted, among other things, that the due process claim was not urged before nor considered by the district court. *Id.* at 1181, 140 N.W.2d at 870. In any event, we declared the fallacy of due process claims related to revocation of a driver's license is that the "so[-]called property right is not such in the ordinary sense. It is a privilege granted to him under certain specific conditions, subject to all laws pertaining thereto at the time the same is issued or may be later enacted." *Id.* Further, on the facts, the court concluded that the plaintiff would have refused the test even if he had conferred with his attorney before the officers requested consent. *Id.* at 1182, 140 N.W.2d at 871. Justices Thornton and Becker dissented. *Id.* at 1186, 140 N.W.2d at 873.

In my view, *Gottschalk* is a doubtful precedent for a number of reasons. First, the issue in *Gottschalk* was not preserved in the district

court. Second, the *Gottschalk* majority disparaged the interest of an individual in a driver's license by characterizing it as a "privilege." *Id.* at 1181, 140 N.W.2d at 870–71. Such a formalistic doctrine is inconsistent with the Supreme Court declarations in *Dixon v. Love*, 431 U.S. at 112, 97 S. Ct. at 1727, and *Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586, 1589 (1971), that a person has a liberty interest in a driver's license. Further, as noted in *Sites*, "[R]evocation of a driver's license may burden the ordinary driver as much or more than the traditional criminal sanctions." 481 A.2d at 199–200. For some, continued possession of a driver's license is essential to earning a living. 481 A.2d at 199–200.

Sewell does cite the above precedents in his brief and appears to proceed on a different due process theory. Sewell relies on a number of right-to-counsel cases involving government misconduct in interfering with the right to counsel. *See United States v. Stringer*, 535 F.3d 929, 941 (9th Cir. 2008) (discussing trickery or misleading interference with defense counsel); *State v. Ferrell*, 463 A.2d 573, 575 (Conn. 1983) (eavesdropping on attorney after feigning privacy of conversation); *People v. McCauley*, 645 N.E.2d 923, 926–27 (Ill. 1994) (discussing how government officials misled attorney to believe that defendant was not present at station when he was in fact being investigated); *State v. Sugar*, 417 A.2d 474, 476 (N.J. 1980) (discussing police eavesdropping on conversation between suspect and attorney).

Responding to the due process argument raised in Sewell's brief, the State argues that the precedents are inapplicable. The State suggests that Sewell is asserting what it labels a "free standing" substantive due process argument applicable in cases where the state wrongfully invades the attorney–client relationship. But the State asserts that law enforcement in this case was completely upfront regarding the monitoring of any phone

call between the attorney and the client and followed the terms of Iowa Code section 804.20.

I agree with the State that the due process cases cited by Sewell relate to wrongful government invasion of the attorney–client relationship and employ what seems to be a variant of the "shock the conscience" test of *Rochin.* 342 U.S. at 172, 72 S. Ct. at 209. I find these cases distinguishable as suggested by the State.

But there remains the due process approach presented in *Sites*, *Waselenchuk*, and *Heles.* Those cases do not deal with police misconduct but instead focus on fundamental fairness in proceedings involving alleged liberty or property interests. On this branch of due process, I would reserve judgment for a later day when the issue is better illuminated by the parties.

**VIII. Remedy.**

Having concluded that Sewell was entitled to counsel at the time he was arrested, taken to the jail, and confronted with the choice of taking the breathalyzer or having his driver's license suspended for an extended period of time, the question remains: What is the proper remedy?

Sewell argues that dismissal of the charges is the only available option. He asserts that the right to counsel is too fundamental to indulge in nice calculations as to the amount of prejudice from denial of his right to counsel.

There is some authority supporting the position. In *State v. Holland*, the Arizona Supreme Court stated that when the right to counsel is violated, the conviction obtained must be set aside because "it is impossible to foresee what advice would have been given defendant had he been able to confer privately with counsel. It is quite possible that he would have been instructed to obtain, in some manner, exculpatory

evidence." 711 P.2d at 595. As a result, suppression of the breath test alone is not sufficient and all drunk-driving charges must be dismissed. *Id.* Similarly, in *State v. Hill*, the North Carolina Supreme Court held that a prosecution should be dismissed when there is a violation of constitutional or statutory right to communicate with both counsel and friends and such denial deprived the defendant of any opportunity to confront the state's witnesses. 178 S.E.2d 462, 467 (N.C. 1971).

But, the State contends that suppression is the proper remedy. The State notes that we have never adopted an automatic dismissal rule for violations of constitutional or statutory rights impacting a testing decision. *See, e.g., State v. Pettijohn*, 899 N.W.2d 1, 38–39 (Iowa 2017) (remanding for new trial); *State v. Walker*, 804 N.W.2d 284, 296 (Iowa 2011) (suppressing evidence wrongfully obtained); *State v. Garrity*, 765 N.W.2d 592, 597–98 (Iowa 2009) (applying the exclusionary rule to evidence wrongfully obtained).

Further, the State asserts that any error is harmless. The State points out that Sewell was charged not only under Iowa Code section 321J.2(1)(*b*), dealing with driving with BAC over .08%, but also under Iowa Code section 321J.2(1)(*a*), which simply requires that the State show driving while intoxicated. Even if the breath test is excluded, the State claims there was sufficient evidence to convict Sewell under the State's alternate theory of drunk driving. *See Garrity*, 765 N.W.2d at 597–98.

There is authority in support of suppression rather than dismissal of cases involving violations of right to counsel in implied-consent settings. But in my view, the question is not subject to a categorical rule but instead is based on the facts and circumstances of the case. For example, in *State v. Keyonnie*, the court held that suppression was the proper remedy when there was no evidence that the defendant was deprived of the opportunity

to gather exculpatory evidence. 892 P.2d 205, 207 (Ariz. Ct. App. 1995). That seems the correct approach. In order to sustain dismissal, the burden is on the defendant to show that there was meaningful investigation or evidence gathering that could realistically have been impacted by the denial of counsel at the critical time.

In this case, however, the defendant in paragraph 6 of his "Written Waiver of Jury Trial and Stipulation to Trial on the Minutes" waived his jury trial rights and stipulated to trial by the minutes only "with respect to the charge of Operating While Intoxicated while having an alcohol concentration in excess of .08 in violation of Iowa Code Section 321J.2(1)(*b*)." The bench trial was expressly based on the stipulation. It seems clear, then, that Sewell did not waive his right to a jury trial and stipulate to a bench trial on the minutes on the State's alternate theory. Therefore, the error in this case cannot be harmless.

Further, on remand, if the State seeks to proceed on its alternate theory,[6] Sewell should be entitled to attempt to show, if he can, that the deprival of timely consultation with counsel created a reasonable probability that Sewell had been deprived of the opportunity to develop evidence for the defense. If Sewell meets this burden, the State must dismiss remaining charges.

## IX. Conclusion.

For the above reasons, I would conclude that the charges against Sewell under Iowa Code section 321J.2(1)(*b*) should be dismissed and the case remanded to the district court for further proceedings on whether the State may proceed to trial under Iowa Code section 321J.2(1)(*a*).

---

[6]I take no view on any potential additional defenses Sewell may have on remand to prosecution under Iowa Code section 321J.2(1)(*a*).